HOGAN v. WESTMORELAND SPECIALTY CO. et al.

(Circuit Court, E. D. Pennsylvania. July 27, 1908.)

No. 31.

PATENTS—INVENTION—SALT DREDGE.

The Hogan patent, No. 752,903, for a dredge for salt or pepper, having a celluloid cap, was not anticipated and discloses patentable invention, as applied to a dredge for salt, although the only new feature of the device is the substitution of celluloid for other materials previously used in making the cap; it being shown that celluloid possesses a property which prevents the salt from absorbing moisture and becoming caked. Also, *held*, infringed.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, § 23.]

In Equity. On final hearing.
See 145 Fed. 199.

Charles Howson and E. M. Marble, for complainant.
Wm. A. Jones and Howard P. Denison for defendants.

J. B. McPHERSON, District Judge. This action is brought to restrain the infringement of letters patent No. 752,903, granted to the complainant on February 23, 1904. The invention, as stated in the specification, relates to "dredges for salt, pepper, flour, etc., but

more particularly for salt, and has for its prominent object the pro-
duction of an article of the character described, which, while being
simple and efficient in construction, also involves features of hygiene
and cleanliness not heretofore presented by articles of this class."

The specification proceeds as follows:

"With the above and other purposes in view, the invention primarily com-
prehends a dredge consisting of a body of nonmetallic material, the neck of
which is provided with molded threads and a cap, the latter in one piece and
wholly of celluloid, said cap having a depending screw-threaded flange, the
thickness of the material forming the said flange and the character of its
connection with the rest of the cap being such as to result in a certain
amount of flexibility enabling a proper engagement of the flange with the
threaded portion of the nonmetallic body irrespective of lack of uniformity
in the threads of either part, a characteristic generally present in articles
where the threads are produced by a molding operation.

"Practice has demonstrated that where two glass or vitreous articles are
molded with threads for mutual engagement, the nonuniform character of
the threads resulting from the molding operation renders the connection of
such parts by their threads extremely difficult. This may be obviated to
some extent by making the threads relatively coarse and the engaging portion
of one of the parts sufficiently ample to facilitate its taking over its com-
panion; but such expedient would manifestly preclude a tight fit. Another
remedy would be to grind the threads after they have been molded, so as to
render them accurate; but such recourse would be both tedious and ex-
pensive and not warranted in the production of a cheap class of articles.
Hard rubber might be employed in the formation of a dredge-cap, and when
the dredge-cap was so constituted it would avoid some of the serious features
of metal. Moreover, a hard rubber cap might be made to possess the flexi-
bility required on account of irregularity in the threads of the engaging
parts; but were such cap employed in connection with a salt dredge even
the comparatively small percentage of hydrochloric acid evolved would be suffi-
cient to unite with the sulphur in the rubber composition and ultimately
result in the disintegration of the latter and consequent injury of the cap.

"By my invention I avoid all the objections noted and secure important
advantages not hitherto obtained. Certain novel structural features and
combinations of parts are also embodied in my improved dredge, which fea-
tures and parts, as well as those previously alluded to, are clearly referred to
in the subsequent detailed description."

Figures 1 and 2 of the drawings are then explained in detail:

"Referring now more particularly to Figs. 1 and 2, A indicates the body
portion of the dredge, which body portion is of a noncorrosive material, and
preferably of vitreous character, such as glass. This body portion may be of
any suitable shape or configuration and includes an upper circular neck,
a, shown as being externally screw-threaded contiguous to its upper end. The
cap, B, of the dredge is embodied in a single piece of celluloid and comprises
the flat top, b, having a series of perforations, b', and a depending annular
flange, b", screw-threaded to engage the threads of the neck, a. I prefer to
make the cap, B, of the thin shell-like character illustrated, so that the varia-
tions of corrugations in the flange, b", will be present at both the inner and
outer sides of the same, such arrangement, together with the shell-like char-
acter of such flange, conferring a limited amount of flexibility, sufficient, how-
ever, to permit the flange threads to readily accommodate themselves to the
threads on the neck for securing a positive engagement and close fit irrespec-
tive of any lack of uniformity in the threads of either part. This flexibility
will be promoted to a considerable extent by reason of the curved character
of that portion, b, of the flange which merges in the flat top, b. The
plain character of the top, b, imparts considerable strength to the cap,
but practically presents a substantially rigid portion capable of serving as
a fulcrum for the flange while undergoing yielding movements due to its
flexibility. Another distinct advantage a cap of celluloid has over a dredge-

cap of glass, or similar vitreous material, is that in molding the article of the last-mentioned material it will be found difficult to produce the openings, b, of the required smallness and number, and at the same time of uniform circular contour, while the comparatively thin top of the celluloid cap admits of the formation of all the openings with circular accuracy during the operation of molding."

The specification concludes as follows:

"By making the cap with a shell-like flange in which the thread corrugations or variations are impressed entirely through the same, in addition to securing the flexibility heretofore adverted to, the cap can be used in connection with either an externally or internally threaded flange; conditions of proportions being suitable.

"It will be appreciated from the foregoing description that a dredge embodying my invention is extremely hygienic, of finished and attractive appearance, and highly efficient, as well as comparatively inexpensive. The lightness of weight of the improved article, when considered with respect to dredges wholly of glass or other similar vitreous material, is appreciable. Such reduced weight also constitutes a favorable factor in the shipment of large quantities of these dredges. Due allowance being made on account of its limited thickness, and bearing in mind its several novel advantages, the cap used in my improved dredge is quite durable."

The claims are four in number, and it is asserted that all have been infringed:

"1. A two-part dredge comprising a body of noncorrosive material having integrally an upper threaded portion and a cap made wholly of a material insensible to the emanations from the salt; said cap embodying a top containing perforations and a flexible threaded flange, the latter in direct engagement with said threaded body portion.

"2. A two-part dredge comprising a body of noncorrosive material having integrally an upper threaded portion, and a thin shell-like cap made wholly of celluloid; said cap embodying a top containing perforations and a flexible threaded flange, the latter in direct engagement with said threaded body portion.

"3. A two-part dredge comprising a body of noncorrosive material having integrally an upper threaded portion and a cap made wholly of celluloid; said cap embodying a top containing perforations and a thin flange having threads impressed through the thickness thereof, and in direct engagement with said threaded body portion.

"4. A two-part dredge comprising a body of glass having an upper portion with molded threads and a thin shell-like cap made wholly of celluloid; said cap embodying a top containing perforations and a flexible flange having threads impressed through the thickness thereof and a direct engagement with said molded threads of the body portion."

The novelty of the invention set forth was denied by demurrer, and defendant's position was sustained by the Circuit Court; but the Court of Appeals reinstated the bill, on the ground that the lack of patentable novelty did not sufficiently appear upon the face of the bill, and that the decision of this question should therefore be deferred until final hearing. This ruling on appeal has, I think, been justified by the proofs that have been taken, by which, as it seems to me, the novelty of the invention within a narrow range has been satisfactorily established. It is undoubtedly true that the two portions of the dredge and the method of uniting them are old, and that the sole novelty of the patent consists in the use of celluloid as the material for the cap; but the testimony seems to bring this use within the exception to the general rule that substitution of material does

not constitute invention. The reasons for this conclusion are so clearly stated by the solicitor for complainant that I cannot do better than to give a somewhat extended quotation from his brief. It should be added that the passage about to be quoted is supported by the testimony, and that its statements are scarcely controverted by the defendant:

"The general rule that substitution of material imports no patentable invention is, however, subject to the very important exception that when, as a result of the substitution, new properties are given to the device, or new or greatly improved results are obtained, then the substitution imports patentable invention. This exception to the general rule is stated as follows in Walker on Patents, as embodying the substance of numerous leading court decisions, including those of the United States Supreme Court:

" 'If the substitution of materials involved a new mode of construction, or if it developed new properties or uses of the article made, it may amount to invention. And substitution of materials may constitute invention where it produces a new mode of operation or results in a new function or in the first practical success in the art in which the substitution is made. So, also, where the excellence of the material substituted could not be known beforehand, and where practice shows its superiority to consist not only in greater cheapness and greater durability, but also in more efficient action, the substitution of a superior for an inferior material amounts to invention.' Walker on Patents, § 29.

"In this dredge, the celluloid cap has the very important function never before performed by a salt dredge, of insulating the salt against atmospheric moisture and thereby preventing caking of the salt in the base and against the underside of the cap, and clogging of the holes in the cap.

"Salt is an extremely deliquescent material; that is to say, it takes up moisture from humid air with avidity. This is a matter of common observation. When it becomes damp, it tends to form a firm cake, and in saltcellars the result of this absorption of moisture is not only the formation of a solid cake in the base of the cellar, but the formation of another cake against the under side of the cap, and the clogging of the holes in the cap. This also is a matter of common observation. Scarcely a person living in the eastern part of our country can have failed to notice this caking of salt in cellars repeatedly, in the summertime. In fact, this caking of salt is one of the most exasperating of the small annoyances of life. It is also a matter of common knowledge that in the past various ineffective attempts have been made to overcome this caking, mechanically or otherwise, for example, a mechanical agitator, as shown in the Putnam patent, No. 221,099, specially referred to by the defendants.

"Now celluloid has a singular property of insulating the salt in the cellar from the moisture of the air, and it is able to do this because of an obscure and almost unknown property, possessed by few other substances, and not possessed by metals and glass, viz., that it has practically no surface moisture film, or, as the technical phrase is, layer of adsorbed (not absorbed) moisture. Most substances, including metals and glass, have against their surfaces, under ordinary atmospheric conditions, a more or less thick layer of condensed moisture—too thin, ordinarily, to be perceptible to the sight or touch, but nevertheless present, as will be shown. Sometimes, in very humid weather, or when a cold metal or glass article is taken into warm humid air, this film becomes visible, and the article is then said to sweat; but the layer is nevertheless present, even when invisible, and analytical chemists well know this fact, for they observe that if an apparently dry glass or metal article be weighed on the sensitive balances chemists use, and then be wiped with a dry cloth and immediately reweighed, its weight is quite perceptibly less owing to the fact that the wiping has removed the layer of adsorbed moisture. Some substances, platinum, for example, have also the property of condensing air as well against their surfaces (which is why platinum is used in certain processes as a catalytic agent).

"Complainant's expert, Mr. K. P. McElroy, a chemist of some 17 years' experience in the United States Agricultural Department and the Patent Office, testified fully as to the existence of this moisture film on glass and most other articles (complainant's record, p. 54), and the correctness of his testimony on this point has not been questioned. Also, the well-known chemical authority Thorpe (Quantitative Chemical Analysis [John Wiley & Sons, New York, 1883, 5th Ed.] p. 26) states as follows:

"'All substances condense upon their surface a certain amount of air and moisture, the weight of which depends upon their temperature. * * *

"'A platinum crucible when rubbed with a dry cloth and immediately weighed always weighs sensibly less after half an hour's exposure to the air of a balance case, owing to the condensation of the air upon its surface. It is advisable therefore to allow the crucible, if freshly wiped, to remain upon the balance pan or in the case some little time before being weighed.'

"The ordinary saltcellar as made prior to the patentee's invention consisted, as shown by various of defendants' exhibits, of a glass base and a metal top, both of which have, to an important degree, the property of collecting on their surfaces layers of adsorbed moisture, and these layers of moisture act as wicks to convey moisture from the external air into the salt within the cellar, in the following manner: Salt in the cellar absorbs from the immediately adjacent walls of the glass base the moisture thereon, and the moisture so absorbed is replaced by moisture from higher up, and finally from the moisture on the surfaces of the metal top, which top in turn abstracts more moisture from the air; the operation being a continuous one and one which, under favorable atmospheric conditions, will soon convert a perfectly dry mass of salt within the cellar into a moist, sticky mass. And there can hardly be a person living in any portion of this country, having, at times, a humid climate, who has not repeatedly observed salt grow moist in this manner, though perhaps few have understood the modus operandi. Complainant's expert, McElroy, has explained this action fully (see complainant's record, pp. 54, 55), and his testimony on this point has not been controverted or its truth questioned.

"It will be seen that the old-style metal-capped saltcellar was an admirable instrument for keeping salt wet—just what was most to be avoided. But patentee's celluloid-capped saltcellar is an admirable instrument for keeping the salt dry—just what is most desired. And it keeps the salt dry because, the celluloid cap having practically no absorbed moisture film, there is nothing to feed down moisture to the inner surface of the glass base and the salt therein. The celluloid cap insulates the salt from the moisture of the external air. This is a feature never before embodied in a saltcellar. It is obviously an extremely important feature, for by reason of it a grave objection to prior saltcellars has been overcome. By reason of the substitution of celluloid for metal, as the material of the cap, the saltcellar or dredge has become possessed of a new function never before possessed by saltcellars, thus bringing the invention directly within the rules laid down in the previously quoted extract from Walker on Patents, § 29, and the decision of the Supreme Court in Smith v. Vulcanite Co., 93 U. S. 486, 23 L. Ed. 952, and numerous other decisions, for example. Frost v. Cohn, 119 Fed. 505, 56 C. C. A. 185.

"While patentee's celluloid cap performs all the functions of the glass and metal tops of the prior art, yet, since it also performs the additional function of an insulator against moisture, a function never before performed by a dredge top, it is in that respect a new element. The combination, in a dredge, of a body and a top, the latter comprising means for insulating the interior of the dredge against moisture of the external air, is a new combination, producing a new and valuable result, and therefore patentable.

"The fact that celluloid differs from most other substances, in that it has no adsorbed moisture film, is not generally known, and therefore it was not obvious that substitution of celluloid for metal or glass would give this result. The result of the substitution is an unexpected result, highly advantageous in its nature, and therefore for this reason the dredge with the celluloid top is patentable. That celluloid has no adsorbed moisture film is testified to by complainant's expert, McElroy, as within his own knowledge (complainant's record, p. 83), and he cites in confirmation the well-known authority Cross &

Bevan (Longmans, Green & Co., London) pp. 4 and 5, where the following statement occurs:

"'The power of attracting water is a property of the cellulose substance itself and is not in any way dependent upon the form in which it occurs. The amorphous modifications of the cellulose obtained by solution and reciprocation in various ways (infra) are equally hygroscopic.

"'The phenomenon is definitely related to the presence of OH groups in the cellulose molecule, for in proportion as these are suppressed by combination (with negative radicals to form the cellulose esters) the products exhibit decreasing attractions for atmospheric moisture.'

"Celluloid being, in the main, a cellulose ester, as testified by Mr. McElroy (C. R., p. 83), the above-quoted statement is, of course, intelligible enough to a chemist as a statement that celluloid lacks the surface moisture film characteristics of most other substances; but that and similar statements are certainly not enough to make it a matter of common public knowledge among the people at large—makers of saltcellars, for example—that a celluloid cap substituted for the ordinary metal or glass cap would keep the salt dry where a metal or glass cap will not. To the general public any such property of celluloid is new and quite unexpected.

"Mr. McElroy's testimony on this point was not contradicted nor its correctness questioned.

"The complainant, O. K. Hogan, in various portions of his testimony, for example, at the bottom of page 9, complainant's record, also answer to XQ. 70 (C. R., p. 23), has testified that the celluloid top does in fact keep the salt dry, and his testimony on this point is not disputed by the defense. Mr. McElroy testified that even in the damp climate of Washington he had never seen salt caked in the base or against the top of a celluloid-topped saltcellar. The action of the celluloid to insulate against moisture is not referred to in the specification of the patent, but this is not strange, for it is not to be supposed that the inventor would know about the moisture film, or that celluloid is devoid of such a film. Only chemists and a few physicists would be expected to have that knowledge. Very likely the patent solicitor did not know of it either, or the patent office examiner who acted on the application. Nevertheless, in view of the evidence and corroborative publications referred to, the existence of such a film on glass and metal, and its absence from celluloid, cannot be doubted. An inventor is not required to state or know the theory of operation of his invention, or to state or know all its advantages and uses. Walker on Patents, par. 175. And he can claim the benefit of later discovered advantages or improvements. All that is required is that he shall have made an improvement, and that he shall illustrate and describe his improved device so that those skilled in the art may make and use it; and this was unquestionably done."

With these facts in mind, and the further fact that the complainant's saltcellar (to which article the manufacture has been confined) has gone into very general use, and has thus been recognized as producing the beneficial results claimed by the patent, I think it is safe to conclude that invention is shown by the device, and that the bill should be sustained. Infringement is not denied. The defendant manufactures and sells a saltcellar with a celluloid cap that is practically identical with the saltcellar of the complainant, and has made no attempt to defend upon the ground of a substantial difference between the articles.

The principal defense is the prior art, but in my opinion none of the references anticipates the complainant's celluloid cap, to which, as already stated, his invention should be confined. Perhaps, the nearest approach to an anticipation is the picture (without printed text) of the celluloid box for talcum powder shown in the trade catalogues of the Arlington Company for 1899 and 1900; but these were private business circulars and not publications intended for general use.

It was urged, also, at the argument, that the action could not be maintained because the patentee had assigned the patent in August 1905, either wholly or in part, and had not joined the assignee as a party complainant. This position is based upon the following instruments in writing:

"In consideration of money paid to me by Henry H. Hogan of Nepera Park, N. Y., I do hereby lease to the said Henry H. Hogan all my right, title, and interest in and to the patent of U. S. No. 752,903 for an improvement in Salt and Pepper Shakers, granted to me February 23, 1904, the same to be held and enjoyed by the above-named person for the term of six years, as fully and as entirely as they could have been held and enjoyed by me if this lease had not been made; provided that this right, title, and interest is used only in connection with the business and agreement named below: This lease, however, cannot be sold or released without the consent of Oliver K. Hogan, and in case of the death of all the persons named in this agreement without (within?) the six years named this lease and business is to revert to the patentee, Oliver K. Hogan.
"Witness my hand and seal this 24th day of Aug., 1905.
"Oliver K. Hogan."

"I also hereby assign my business and stock at No. 72 Murray St., New York, N. Y., for the term of six years to the following persons, Henry H. Hogan, Albert Z. Hogan, and J. C. Hogan, to be used and managed by them according to their best judgment.
"Witness my hand and seal this 24th day of August, 1905.
"Oliver K. Hogan."

"In consideration of the above lease and assignment, it is hereby agreed that the claims now held against Oliver K. Hogan by Henry H. Hogan, Albert Z. Hogan, Elizabeth E. Hogan, Mrs. Wm. H. Hogan, Alice G. Hogan, and J. C. Hogan shall be paid in full from the profits of said business in gradual payments; and it is also agreed that the said Oliver K. Hogan and Henry H. Hogan, Albert Z. Hogan, Elizabeth E. Hogan, and J. C. Hogan are to receive (1/5) one-fifth of the total profits of the said business, the same to be payable weekly or monthly. And it is agreed that O. K. Hogan is to have access to the books for examination upon request. In the event of the recovery of any damages from infringement suits the same is to be divided equally between the following persons, H. H. Hogan, A. Z. Hogan, Oliver K. Hogan, J. C. Hogan, Alice G. Hogan, Mrs. Wm. H. Hogan, J. K. Kestler, and Geo. N. Hogan.
"Witness our signatures this 24th day of August, 1905.
"Henry H. Hogan.
"Albert Z. Hogan.
"J. C. Hogan."

These instruments are obviously a connected whole, and should be construed together. Thus considered, I am of opinion that the patentee did not assign his patent thereby, but merely granted a license to Henry Hogan for the term of six years. If this construction is correct, the bill is brought by the proper party, and the argument now under consideration cannot be sustained.

It remains to say a word concerning the first claim. In the present state of the proof, I am not satisfied that the claim can be supported so as to cover every material insensible to "the emanations from the salt"—whatever the quoted phrase may mean—and I must therefore decline to enter a decree in favor of the validity of this claim. This ruling, however, is to be without prejudice to the complainant's right to raise the question hereafter in another suit. Whether, in view of the restrictive statements contained in the specification, and of the grounds upon which the patent has been held to be good, it can be sus-

tained for any other article than a dredge for salt, need not be decided upon this record. It is a dredge for salt that is manufactured by the complainant, and a dredge for salt that infringes, and to such article the decree will be confined.

A decree may be entered sustaining the validity of the last three claims, and directing the defendant to account.