GENERAL ELECTRIC CO. et al. v. STEINBERGER.

(District Court, E. D. New York. October 9, 1913. Modification of Opinion, October 16, 1913.)

1. PATENTS (§ 114*)—SUIT TO OBTAIN PATENT—FINDINGS OF PATENT OFFICE.
   In a suit in equity to obtain a patent under Rev. St. § 4915 (U. S. Comp. St. 1901, p. 3392), while the court must make its own independent findings, even though the testimony is identical with that before the Patent Office, it must in such case treat the findings of the Commissioner of Patents and the Court of Appeals of the District of Columbia as those of tribunals having jurisdiction with respect to matters properly before them, and their determination should not be disturbed unless shown to be plainly and unmistakably erroneous.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. § 166; Dec. Dig. § 114.*]

2. PATENTS (§ 92*)—VALIDITY—SUCCESSIVE APPLICATIONS.
   No inference of wrongdoing is to be drawn from the filing of a sole application for a patent by one who had previously united with another in a joint application relating to the same subject-matter, unless the circumstances indicate falsehood or deceit.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. § 124; Dec. Dig. § 92.*]

2. PATENTS (§ 114*)—PERSONS ENTITLED TO PATENTS—DISCLOSURE TO ONE OF JOINT APPLICANTS.
   Where two persons filed a joint application for a patent, any disclosure previously made by another to one of the applicants, in the absence of evidence to the contrary, must be presumed to have been made to the other.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. § 166; Dec. Dig. § 114.*]

4. PATENTS (§ 328*)—PERSON ENTITLED TO PATENT—DISK INSULATOR.
   The disk insulator for high power electric lines, having rain-shedding annular corrugations, covered by the claims put in interference by the Patent Office between Hewlett and Steinberger, as a result of which patent No. 904,370 was issued to Steinberger, held to have been invented by Hewlett, who, as the inventor first making use of the invention by filing his application, is entitled to the patent therefor based on the counts of the interference proceeding, so limited as not to include a unitary disk insulator with merely nonrain-shedding annular corrugations or with annular corrugations at right angles to the plane of the disk.

5. PATENTS (§ 92*)—DATE OF INVENTION—REFERENCE TO PRIOR APPLICATION.
   Where one who united in a joint application for a patent later filed a sole application for the same subject-matter, the joint application is evidence of conception of the invention by the sole applicant at the date of its filing.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. § 124; Dec. Dig. § 92.*]

6. PATENTS (§ 114*)—SUIT TO OBTAIN PATENT—CONTENTS OF DECREE.
   While the court, in a suit under Rev. St. § 4915 (U. S. Comp. St. 1901, p. 3392), to obtain the issuance of a patent to complainant for an invention patented to another, may construe the claims in issue, it should not alter such claims, as such alteration would interfere with an action under section 4918.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. § 166; Dec. Dig. § 114.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Equity. Suit by the General Electric Company and Edward M. Hewlett against Louis Steinberger. Decree for complainants.

Charles Neave and William G. McKnight, both of New York City, for plaintiffs.

Charles H. Wilson, of New York City, for defendant.

CHATFIELD, District Judge. The present suit is brought under section 4915 of the Revised Statutes (U. S. Comp. St. 1901, p. 3392), by which an applicant is given "remedy by bill in equity" "whenever a patent on application is refused" by the Commissioner or by the court of the District of Columbia "upon appeal." Adverse parties must have notice, and it necessarily follows, if the defeat of the applicant has been the outcome of an interference proceeding, or based upon a determination that some other applicant is the original inventor or is entitled to the patent, that the successful applicant is a necessary party to the bill in equity, and a decree therein in favor of the plaintiff will carry a determination of invalidity or lack of right in the record patentee. Laas v. Scott (C. C.) 161 Fed. 122. The resultant proceedings in the Patent Office will necessarily be the issuance of a patent to the plaintiff and a cancellation of the grant by letters patent previously issued.

On appeal to the Circuit Court of Appeals of the District of Columbia from a decision of the Commissioner of Patents, the case is heard in the nature of a review, and the finding of fact of the Commissioner must be considered from the standpoint of the record as made on the appeal.

[1] But, in a proceeding under section 4915, the testimony is taken de novo, and, while the record may be identical with that in the Patent Office, nevertheless the court must make its own findings upon the testimony. In so doing, it must treat the conclusions of the Commissioner of Patents and of the Court of Appeals as findings of a tribunal having jurisdiction with respect to the matters determined in the Patent Office, or upon appeal therefrom, and, in so far as these determinations are shown to have been made upon the same facts as those presented to the court in the action under section 4915, they should not be disturbed unless shown to be plainly and unmistakably erroneous. Laas v. Scott, supra; Automatic Weighing Machine Co. v. Pneumatic Scale Corporation, 166 Fed. 288, 92 C. C. A. 206; Morgan v. Daniels, 153 U. S. 120, 14 Sup. Ct. 772, 38 L. Ed. 657.

The plaintiff's case has to be proved only by a preponderance of testimony, but it must be testimony which the court believes, and that belief involves proving to the court's satisfaction that the findings of the Patent Office were incorrect. All reasonable doubt must be removed and thorough conviction must be had. Such is believed to be the doctrine expressed by the Supreme Court in the cases of Coffin v. Ogden, 18 Wall. (85 U. S.) 120, 21 L. Ed. 821, Cantrell v. Wallick, 117 U. S. 689, 6 Sup. Ct. 970, 29 L. Ed. 1017, and Morgan v. Daniels, supra.

In the present action a large amount of testimony has been offered to show, upon the present record, the entire transaction and all the

material acts of the parties concerned therewith, both in and out of the Patent Office, and with respect to matters having to do with the rights to the patents involved, even. though the Patent Office proceedings did not contain testimony of the same sort.  In some instances this additional testimony is offered as newly discovered evidence.  In some instances the new testimony is presented to explain and rebut the conclusions of the Patent Office, upon the record which was before it.  In some instances the new testimony is offered as to matters which were not thought relevant or necessary for presentation to the Patent Office in the previous hearing.

In general it must be held that all such testimony is competent and must be considered by the court in the action under section 4915, but in so far as the conclusions of the Patent Office, as sustained on appeal, are treated as a fair determination, upon similar testimony, and hence as being valid unless plainly erroneous, and in so far as the parties to the interference proceeding may have been estopped from asserting things inconsistent with their claims before the Patent Office, this court will not use the additional proofs in reaching a conclusion on the right to the patent, until it has determined whether the defeated party is in a position to contest further, or to give additional testimony about, the matters thus previously determined.

So far as the subject-matter of the action is concerned, the record proceedings introduced in evidence, and the discussion of the questions presented therein, it is unnecessary to restate here what has been so well expressed in the various opinions that must be read as a part of the consideration.  These opinions show clearly the various record dates and steps of the transactions, and the discussion in the present case will take them up from the evidence in this action, bearing thereon.  These various opinions will be used, therefore, as if their statements had been set forth in full.  The first Buck & Hewlett application generally will be referred to as the "abandoned Buck & Hewlett application," the patent issued to Steinberger, as the result of the interference (No. 904,370), will be referred to as the "Steinberger patent," and the sole application by Hewlett for certain claims of the Buck & Hewlett application will be called the "Hewlett application."

The earliest of these opinions on the merits of the application was rendered November 2, 1911, by the Examiner of Interferences, after final hearing upon the 13th of April of that year, and determines that Steinberger was not entitled to a patent for the device covered by certain counts which had been put into interference by the office and accepted by both Steinberger and the plaintiffs in the present action.

It will be seen that in the present case these counts broadly apply or can be read upon a structure having annular flanges, corrugations, or rings, projecting from the face of the disk, on opposite sides of the disk, and set at any angle to the face of the disk.  But each of these annular flanges, as shown in the exhibits, in the drawings, and in the testimony both before the Patent Office and the court, are slightly thicker at the point of union with the disk, have in general parallel sides, and each pair of flanges, while generally "opposite" one another, yet inclose an angle of substantially 90 degrees between the

sides away from the axis and some 270 degrees between the sides toward the axis instead of being opposite in direction; that is, 180 degrees away from each other.

It appears that Steinberger, in the Exhibit Y5, as well as in other patents issued to him, and as shown in various patents of the prior art, understood and used the water-shedding properties of such a flange, and that he, or any other person with the intelligence of an ordinary mechanic, could have appreciated the effect of two such flanges upon opposite sides of the disk, as distinguished from two flanges opposite to each other; that is, in the same general plane or extending at an angle of 180 degrees from each other.

As has been said, the drawing Y5 and the claims of the Steinberger patent as actually issued and as finally allowed by the Patent Office point out this fact. In the same way the Hewlett application and the Hewlett drawing (Exhibit 10c), as also the abandoned Buck & Hewlett application, show what are called "obliquely projecting flanges on opposite sides of the periphery," and the drawings of the abandoned Buck & Hewlett application contain (Figs. 5, 6, 8, and 9) these obliquely placed flanges, and also other flanges or annular rings, at a right angle to the face of the disk and nearer the center than the oblique flanges, on the "opposite" side of the disk from the corresponding flange of similar angle. Of these annular flanges or rings, however, in the Steinberger patent and in·the abandoned Buck & Hewlett application, the obliquely placed flanges do not extend in exact opposite directions from each other, and the original Buck & Hewlett abandoned application, claims 4 and 5, called, in a general way, for "rain-shedding flanges" or "means for deflecting rain."

When the interference was suggested, the counts ultimately used and accepted by all parties, and which ultimately appear as claims 9, 10, and 11 of the Steinberger patent, were therefore broadly interpreted to include the obliquely set rings, as well as rings substantially opposite to each other in direction, and hence to cover exactly the disclosures of the Steinberger specifications and drawings, as well as those of the abandoned Buck & Hewlett application and the single Hewlett application, of which the claims were then in interference.

But the claims of the patent must be read in the light of the disclosures of the patent when tested by the prior art and cannot be interpreted so broadly as to protect the old devices of corrugations alone. The original claim 15 of the Steinberger patent was in language broad enough to cover mere corrugations. This was rejected by the Patent Office as "inaccurate" and "not presenting patentable matter." This action was acquiesced in by Steinberger and was correct. The present claims, therefore, cannot be read so broadly as to cover and to be held as having allowed this unpatentable structure. Condit Electrical Mfg. Co. v. Westinghouse Electric & Mfg. Co., 200 Fed. 144, 118 C. C. A. 474; Cotto-Waxo Chemical Co. v. Perolin Co. of America, 185 Fed. 267, 107 C. C. A. 373; Simplex Electric Heating Co. v. Leonard, 200 Fed. 581.

Another peculiarity which must be noted at this time is that the effect of the obliquely set flanges, so far as the quality of shedding

rain is concerned, was also plainly shown by the specifications and drawings of the Steinberger application, as ultimately embodied in his claim 6, in which the central disk or disk plane is carried out so as to extend between the obliquely set flanges in a manner not considered or suggested by Hewlett or Buck and not indicated in the commercial structure, Exhibit 16, introduced upon the trial. Claims 7 and 8 also show sets of annular flanges in particular combinations but in general modified or typified by claims 9, 10, and 11.

It was admitted upon the trial by all the parties that these claims (6, 7, and 8) of the Steinberger patent would necessarily infringe claims 9, 10, and 11 if those claims (9, 10, and 11) had been allowed to Hewlett instead of to Steinberger, because Steinberger had not sought to patent the form of disk described in claim 6 or the general flanges of claims 7 and 8 in any way except in conjunction with the obliquely placed rings of claims 9, 10 and 11. It was further admitted by all of the parties, and is apparent from the record, that no attack in this suit can be made upon the Steinberger claims upon the ground that they are too broad. They have been used by all of the parties to fit the disclosures of the patent, and the issue is as to the right to the allowance of the counts of the interference on the assumption that they are proper claims to cover the structure. If Hewlett was entitled to be granted a patent upon his application, then Steinberger would, so far as this case is concerned, lose all of the claims under which insulators with the obliquely set flanges could be constructed and hence would have no claims (for the disk with such flanges) upon which a patent could be granted to him, after the Hewlett patent was issued.

The matters of record upon the merits of the case are recited in the opinions of the Examiner of Interferences, decided November 2, 1911, the decision of the Examiners in Chief April 29, 1912, the decision of the First Assistant Commissioner dated August 6, 1912, and of the Court of Appeals of the District of Columbia upon the 25th of April, 1913. In addition, upon May 25, 1912, an opinion was rendered by the Assistant Commissioner deferring consideration of a petition to dissolve the interference between Steinberger and Hewlett's assignee, on the ground of alleged fraud and irregularity by Hewlett, for the reason that material questions were presented which would be considered upon the appeal then pending. This opinion, therefore, presents no decision of any point here involved.

An opinion filed by the Assistant Commissioner upon the 13th day of January, 1913, asking for the recall from the record in the Circuit Court of Appeals of a certified copy of the interference record, for the purpose of eliminating three patents included by request of the plaintiffs in the present action, and in which opinion the conduct of counsel for Hewlett, in obtaining the certification of these papers, was harshly criticised, can be considered by this court only in so far as the facts reviewed by the Commissioner and shown in the record may bear upon the question of credibility or motive of the parties affected. The conclusion of the Commissioner that criticism was deserved has no bearing, by itself, upon the issue here.

The solicitor for Hewlett contended that any patent relating to the subject-matter of the application, and presumptively considered by the Patent Office, could be brought particularly to the Examiner's notice or used before the Commissioner or court upon appeal. Upon an assumption that the Examiner had considered such patent and that the Court of Appeals might do so, the Commissioner was asked to make it a part of the record. Even if included in the printed record, the court could have disregarded as a part of the record below any paper which that record did not show had been actually considered by the Patent Office, or could have determined for itself whether it would use the paper in its own deliberations. And it would seem the Assistant Commissioner's personal opinion that counsel had tried to deceive the office had no bearing upon the question as to whether the Court of Appeals would exclude these patents from the record, in its consideration.

Upon the 26th day of July, 1913, a further motion to strike the Hewlett application from the files of the Patent Office, or to refuse the issuance of a patent thereon, upon the alleged ground of fraud, was denied by the Commissioner, without prejudice to renewal after the termination of the present action in equity, and presents no decision upon any of the points involved herein.

So in this court the only bearing of the matter is with respect to the question of credibility of the persons involved therein. The court finds no issue raised with respect to the determination of the Patent Office that the counts in the interference proceeding covered a patentable invention, and must accept the conclusion of the Patent Office on that point, unless it appears clearly erroneous upon the face of the record. But the record in this court clearly shows such patentable invention, independent of the conclusion of the Patent Office, and hence no discussion is necessary except to analyze the actual invention.

It appears that disk insulators and disks on insulators were old in the art (Steinberger, No. 786,691, April 4, 1905; Ball, No. 698,097, April 22, 1902; Buck, No. 876,939, January 21, 1908; Locke, No. 520,367, May 22, 1894).

It appears that strain insulators were old in the art (Van Sands, No. 362,682, May 10, 1887; Ball, No. 530,498, December 11, 1894; Steinberger, No. 786,691, April 4, 1905; Sachs, No. 778,507, December 27, 1904).

The use of a plurality of insulators in series (of either the pin type or of the strain type) was old (Barry, No. 717,322, December 30, 1902 [line 68]; Van Sands, No. 362,682; Ball, No. 530,498; Sachs, No. 778,507; English Patent to Richardson, No. 9517, March 23, 1905).

The idea of strengthening the structure by making either the hub or support of the insulator integral with the surface, whether skirt or disk, was old (Ball, No. 530,498; Steinberger, No. 786,691; and most pin insulators).

The massing or thickening of material to furnish greater strength in an integral body was old and illustrated by the formation of all pin insulators.

The idea of extending the insulating surface by corrugations, or by the interposition of a skirt or flange, was old (Sachs, No. 778,507; Bain, No. 443,187, December 23, 1890; Locke, No. 573,092; McCarthy, No. 756,181, March 29, 1904; Van Sands, No. 362,682).

The idea of using a flange or skirt or annular ring to cause the shedding of water, either by draining off the water vertically or (if the axis be horizontal) by causing it to follow around the channel of the flange, and thus to drop off at some point, at least as far from the axis as the length of the radius of the channel, was old (Buck, No. 876,939; Ball, No. 698,097; McCarthy, No. 756,181; and the old pin insulators).

The patentable idea, as recognized by the Patent Office, was a unitary disk strain insulator; that is, an integral insulator capable of being used as a complete unit in a series and showing, in one structure, a combination of parts, all previously well known both in form and functions, but which, by the new combination, would meet conditions and produce results that had never before been provided for in a single or unitary structure, in the way in which the result was accomplished in the structure shown both by the Steinberger application and by the Hewlett.

Any development of the pin-type insulator, or of a suspension insulator, with eyebolts or links substituted for the pin, which involved merely the old idea of shedding rain and furnishing protection to the surface portions under the eves or skirts of the insulator, fell far short of disclosing the cheap, commercially practicable, and simple insulator formed by combining the two annular flanges or obliquely set rings in such positions, upon the opposite sides of the insulator, that under all usually expected conditions substantially the entire amount of moisture would have to be deflected by one flange or the other from the inner or under surface of that flange.

The Exhibits Y1, Y2, and Y3 (the existence of which is traced back to the year 1904, prior to a change in the Electrose Manufacturing Company's organization) with Y7 filed in the office of Munn & Co. on October 18, 1905, present the designs shown in the Steinberger patent, No. 913,439, application for which was filed November 27, 1905, and No. 859,703, application filed May 1, 1906.

It is clear that the idea of increasing the surface to prevent surface leakage, the idea of shedding water to protect the under surface of the water-shedding rings, as well as the idea of placing these rings upon both sides of the disk of a so-called disk insulator, and of thus protecting the entire circumference of the under surface, which might be surrounded by any ring, were present in Steinberger's mind before October 18, 1905, and were acted upon by him with proper diligence when applied to vertical or pin-type insulators.

The next sketch, Y4, contains the exact idea communicated by Steinberger to Buck, and upon which the alleged disclosure of the patentable idea was given to Buck and Hewlett.

The sketches Y3 and Y4 both show appreciation by Steinberger of the availability of a link insulator for suspension in a horizontal position, and Y4 is substantially the same as the small sketch marked Ex-

208 F.—45

hibit 21b upon this trial and sent in the letter from Steinberger to Buck upon the 7th day of October, 1905:

Although the entire record in the Patent Office and every issue presented in the present action is set forth in the various opinions above referred to, it will be necessary to state, in sufficient proximity to carry them in mind, some of the dates from which the rights of the parties are established, and it will be further necessary, in a consideration of the present case, to refer to the testimony presented in court and to discuss this in its bearing upon the questions accurately outlined in the decisions quoted above.

The defendant Steinberger, during the years between 1892 and 1905, had been president of the Electrose Manufacturing Company and had been interested in the use of the material called electrose for insulating purposes. He had taken out a number of patents which, in connection with the prior art, show (as has been already stated) full appreciation on his part of the increase in electrical resistance by an extension of the intervening surface, such as is afforded by corrugations, by the interposition of a skirt or hood, or by enlargement of the insulator. The factor of expense, in connection with the use of larger devices and more material and in the manufacture of complicated forms, was well known to him. It also appears that he thoroughly understood and appreciated the interference with insulation against electric currents of high potential, caused by a flow of water, and by the presence of moisture upon the surface of the insulating material. He appreciated fully the necessity of providing some protected surface when an insulator was exposed either to continuous streams of water from heavy rainfall or to the formation of a surface film of moisture on the under surfaces when the insulator was subjected to rain or storm from different directions than from directly overhead.

Steinberger knew, and every one acquainted with the art knew, that upon any form of so-called pin insulator the surrounding and protecting skirt or flange had the effect of a hood, like the eves upon a house, and furnished a dry space under this skirt or projection, and that this not only caused the water to be shed but prevented the capillary spread of a film of moisture and led off all water, except that retained around the rim of the skirt, at at least as great a distance from the conductor as was furnished by the depth of the under surface of this skirt, and that the width of this dry surface, as well as the length of path, was increased by enlargement of the circumference and the resultant lengthening of the skirt.

Steinberger knew, and it was old in the art, that if a skirt or annular flange or corrugation or disk was placed upon a horizontal axis supporting a conductor, such as was shown in the Buck patent, No. 876,-939, and the Steinberger patent, No. 853,745, water falling upon the insulator would be led around in the channel of the annular ring and would fall to the ground either at the greatest horizontal diameter of the channel or at its lowest point. Such flowing water would not rise over the outer circumference of the disk, and the length of the insulating medium would be increased, except as against leakage or creepage

by way of the film of water which would form from rain falling upon all of the disks or corrugations at the same time and from the continuous stream of water running off at the lowest point of the channel and out to the circumference of both faces of each disk upon its lower side.

Steinberger knew from his experiments that disks of electrose 14 inches in diameter, and of reasonable thickness, would not be punctured by a current of exceedingly high potential, even of some 250,000 volts; and he knew that such a disk, with an integral hub or central portion, could be made to furnish means of suspension of considerable strength.

Steinberger knew that means of suspension, in the form of eyebolts or of links with conical bases, partially surrounding each other (so to furnish a compressing strain), or apertures through which a cable or wire could be passed, would allow the insulating disks to be used in series, or one at a time, and he also knew that strain insulators, such as those shown by his own patent No. 735,611, the patent to Ball, No. 530,498, the patent to Sachs, No. 778,507, or the English patent to Richardson, No. 9517, of 1905, could be suspended in any position, or at any angle, and no invention would be involved in the mere use of such an insulator in a different position or for a different purpose without change of function.

One of the oldest patents cited, that to Van Sands, No. 362,682, shows a suspension insulator, capable of use as a unit, having a "flaring shield" extending entirely around the axis (that is, around the conductor), with at the same time a "flaring guard" inside the circumference of the flaring shield and extending nearly at a right angle thereto but not coming in contact with the underside thereof. This had been expressly designed for use in connection with electric light wires to shed water, to prevent the entrance of moisture, and to afford a sufficient surface insulation. This was not a disk insulator, and the annular flanges or obliquely set circular shields did not project from the opposite sides of the disk in any such way as to show the simple, cheap, and practical unitary commercial form of either the Hewlett or Steinberger design, and hence was not an anticipation of the claims in interference.

But these patents of Van Sands, Ball, and Steinberger, and the admitted unpatentability of a simple disk, as added to the Ball and Steinberger spheroidal or circular insulator, or the use of simple corrugations to increase surface, must be borne in mind when considering what (as the Patent Office correctly found) was invention, as represented by the counts in interference, and must be considered in connection with all of the transactions between Steinberger and Buck or Hewlett as to any disclosures of patentable invention.

Buck had been in the employment of the Niagara Falls Power Company as an engineer. He had had considerable correspondence with Steinberger during the years 1902 and 1903 and was in general familiar with the use of electrose and the form of insulators patented and placed upon the market by Steinberger. He had made tests upon them and up to the 17th of August, 1905, had received from Steinberger in-

formation generally as to all of Steinberger's ideas which had been reduced to practice. On the 17th of August, 1905, while interested in the construction of a transmission line by the Niagara Falls Power Company with currents of exceedingly high potential, Buck talked with Hewlett, whom he had previously known while both were employed by the General Electric Company, and an agreement was reached between Buck and Hewlett that they would collaborate in working out a system of transmission. This conversation took place at Niagara Falls, after a meeting of engineers, attended by Hewlett, and there seems to be no reasonable ground for doubting that it occurred, as stated by Hewlett and Buck. The tangible evidence of tha. conversation is a sketch, partially drawn by Buck and partially drawn by Hewlett, marked Exhibit 7 in this case, in which certain towers for sustaining the conductors are outlined, and the conductors themselves are indicated as sustained by three tension members placed substantially 120 degrees apart.

One of Buck's suggestions for these tension members or insulating means is shown upon the drawing to be a corrugated stick, and his testimony is to the effect that he had been experimenting with such corrugated hickory sticks a few days before.

The old idea of a string or series of insulators or hoods, which had been previously shown in the various patents, such as Locke, No. 779,659, and which later was brought in as a reference by the Patent Office, and in the Scholes patent, No. 876,596 (this particular reference was unavailing because of the date of the Scholes application), was made use of by Hewlett and acquiesced in by Buck. This string or series of insulators show disks suspended vertically, one under the other, by eyebolts or loops and with each disk protected by the usual skirt or hood.

The ordinary knowledge of Buck and Hewlett as to the needs of the structure (and as indicated by the other sketches on Exhibit 7) with the series of hood insulators suspended at different angles around the entire circumference in the plane of suspension show that both men had in mind protection, by hoods or flanges set at different angles, in conjunction with the skirt or flange of the old pin insulators, and the necessity of protecting from rain and surface moisture at the angles at which the disks would be suspended. They put Buck and Hewlett in the exact position where the invention claimed in this suit was desirable and could readily be conceived by the man to whom the idea should occur.

Hewlett went back to Schenectady and, as appears from the testimony, experimented upon the construction of insulators for the purpose desired, particularly as his line of work with the General Electric Company was that of insulation.

Some confusion has resulted and contradiction has occurred in the proceedings before the Patent Office and in this suit with respect to just what Hewlett did. In the affidavit filed in the interference proceeding, he has stated that his drawings were made upon the 17th of November, 1905, but that he made a model and experimented during

October, 1905, along the lines of the drawing shown, which has been called Exhibit 10c in this case.

Other testimony which is persuasive would indicate that Hewlett had been experimenting and had attempted to use a so-called "saddle" form of porcelain insulator, which did have the interlocking apertures or loopholes for the insertion of the conductor, as in the Hewlett structure, and did have an integral enlarged central mass or portion integrally molded with a disk portion which was turned into the shape of a saddle and is shown in Fig. 3 of the patent to Brooks, No. 578,- 542. Hewlett was also experimenting with metallic bands around disk surfaces and, if the testimony of himself and his witnesses is to be believed, had arrived at a point, by the 17th of November, 1905, where he wrote to Buck, in reply to one of Buck's communications, that he acquiesced in all of Buck's ideas except the form of insulator, and that he inclosed a sketch of a design for an insulator which he thought would serve the purpose desired by both. In drawing this sketch Hewlett says that, according to custom, he placed several sheets of paper, with carbon sheets between, under the paper upon which he made the sketch. Although Buck has been unable to identify or to produce with satisfactory identification the sketch sent to him or the letter accompanying it, the plaintiff has produced a paper purporting to be this original sketch, and at least two of the carbon duplicates, and they show the precise design subsequently used in the Buck & Hewlett application, and later the sole Hewlett application upon which interference was declared with Steinberger.

A few days after the 17th of November, 1905, Buck came to Schenectady, according to the statements in his letters, and there saw experiments conducted with certain disk insulators, which had been made by the Electrose Manufacturing Company substantially along the line of the plain disk insulator contained in the sketch of Buck & Hewlett, of August 17, 1905 (this part of the sketch having been made by Buck). These experiments were not entirely satisfactory, but Buck is positive that up to that time he had not seen a model of the insulator suggested by Hewlett, and his conduct and recollection of this visit show that the Hewlett sketch did not convey to his mind the desirability of the Hewlett form of insulator, and that he did not relinquish his own ideas until after his visit to Schenectady.

The attorney for the General Electric Company prepared specifications and application for a patent for the transmission line by Buck & Hewlett, and this application was signed and verified by both Buck and Hewlett and filed on February 15, 1906, in the Patent Office. The claims presented in that application included claims for the disk insulator set forth in the Hewlett sketch of November 17, 1905, as a separate invention, and yet both Buck and Hewlett verified the application, stating that it was the belief of each that the matters contained therein were joint inventions.

The proceedings in the Patent Office which immediately followed called for some communication from Buck, in which, in order to save the patent, he suggested further attempts to perfect the claims for the insulator structure, but without questioning his own title as joint in-

ventor. Hewlett also participated in the discussion about the actions of the Patent Office, and it should be noted that both Hewlett and Buck had assigned their rights in the particular application to the General Electric Company at the time of filing.

In the fall of 1906 Hewlett found that the insulators (which had in practice been simplified by the removal of the inner annular flange set at right angles to the face of the disk) could be used commercially for other purposes than the high-power transmission line, as described in their patent application, and actually sold some of these commercial devices, thus giving to the world any ideas contained therein, not covered by the applications under consideration in this case, inasmuch as no other patents were applied for within the space of two years. In 1907 both Buck and Hewlett described, at a meeting of the Society of Electrical Engineers, the details of their plan for a transmission line, as well as Hewlett's type of insulator. This came to the attention of Steinberger, who testifies that he then told Buck that this Hewlett insulator was really his (Steinberger's) invention and that Buck did not deny this. Buck testifies that he does not remember the interview, and there is some confusion as to where his office was at the time. But the question is only illustrative of a certain amount of indefiniteness in Buck's recollection as to many matters as to which he was questioned, and does not conclusively prove anything as to the priority or originality of the Hewlett device. Steinberger then looked into the question of his own drawings and ideas and also his communications to Buck and apparently arrived at the conclusion that he was not only the inventor of a form of insulator which comprised all of the elements of the Hewlett device but that his correspondence and communications to Buck had been the source of the design perfected by Hewlett and included by him and Buck in their application for a patent.

Considerable argument has been had by the Board of Examiners and by the Commissioner of Patents, as well as by the Court of Appeals of the district, with respect to the effect of any disclosure by Steinberger to Buck. It appears from the present record that whatever disclosure was made by Steinberger to Buck was known to Hewlett, with the possible exception of what has been called drawing No. 2 of Exhibit 24. As to this, Hewlett denies that the particular design was ever transmitted to him, although he did receive the insulators for experiment, comprising an integral mass with imbedded eyebolts, attached to a disk 14 inches in diameter, slightly thinner at the periphery than where joining the central portion, and made of electrose, as ordered by Buck from Steinberger for the purpose of experiment, after Buck and Hewlett had jointly undertaken to work out the transmission line.

The correspondence between Buck and Steinberger shows that Steinberger called to Buck's attention the use of corrugated rings, three or four in number, upon each side of the disk, as ordered by Buck; that the purpose of these corrugations, as stated by Steinberger, was to increase the insulating service, and that they could be varied in details to meet any requirements.

Steinberger claims that his knowledge, the same as that of Buck

and Hewlett, was sufficient at that time to thus protect any advantages or uses to which it might subsequently appear a variation of this form of device might be put. He claims, and his expert in this trial has presented, a drawing to show that the corrugated rings upon the disk, if enlarged, would form annular flanges, performing the functions of those disclosed in both the Steinberger and Hewlett patents. He reads upon the structure shown in this drawing, Exhibit 24b, the counts of the interference, and the only point as to which argument can be had is whether the broad words of this count, viz., "annular flanges extending in opposite directions," would be anticipated by a device showing corrugations or rings enlarged into flanges and extending at right angles to the face of the disk.

It must be admitted that such an enlarged corrugating ring would be an infringement against the claim shown in the interference count, if this could be considered as including every form of corrugating flange or water-shedding annular ring, even if such form was old in the art. Both the Examiner of Interferences and the Commissioner of Patents have discussed at considerable length in their opinions the question whether the counts of the interference should be construed so broadly as to include the Steinberger drawing (Exhibit 21b) or should be limited to the ideas presented in the specifications and drawings of the Hewlett and Steinberger applications.

If the Patent Office had limited the counts suggested in the interference to the claims as presented by Hewlett or to the structure actually shown by the specifications and drawings of Steinberger, the question would not arise. But Steinberger and Hewlett have brought this action, and the decisions of the Patent Office have been based upon the assumption that the counts of the interference and the claims finally allowed in the Steinberger patent are an accurate description of water-shedding flanges or flanges set at an oblique angle, with an annular channel or ring surrounding them on the outer side. If the precise form of this claim should be corrected and modified by the Patent Office before final allowance, after this trial, that is nothing with which the court should concern itself and would remove the necessity for this argument.

It cannot be held that an enlarged corrugating ring or annular flange, which merely increases the path or extends the resisting surface, would be an anticipation of the claims which should be allowed to Steinberger or Hewlett; nor can it be held that Steinberger's statement as to such corrugating rings would be a disclosure of the patentable idea.

The commercial use of the modified insulator from the Buck & Hewlett application is stated by Hewlett to have caused him to question Mr. Davis, the general patent counsel of the company, who had prepared the Buck & Hewlett joint application, as to the advisability of attempting to patent the insulator separately as Hewlett's invention and as to the effect upon his claimed invention of the application by Buck & Hewlett, in which it was claimed to be the joint production of both. Buck was not consulted, but investigation by the office led to the preparation of an individual application by Hewlett for a

patent for this particular insulator. This application states expressly and in detail the availability of the annular flange placed obliquely on opposite sides of the disk for the purpose of shedding water and preventing the formation of a damp film; or, in other words, the preservation of some dry surface, under the effect of rain from any direction. The same purposes had been stated in the joint application, but the claims were differently worded.

Hewlett made an affidavit that he was the sole inventor, and no mention was made of the Buck & Hewlett prior affidavits as to joint invention. The counsel for the General Electric Company forwarded this application to the Patent Office and instructed his own office to look into the circumstances to see whether Hewlett was entitled to the sole invention. He thereby made it possible to prosecute both applications in the Patent Office, and (unless they happened to come before the same Examiner or be in the same division) it might not result in the declaration of an interference between the joint application and the Hewlett application until such time as some one in the Patent Office became cognizant of both applications.

It appears that the result of such contradictory applications could be only disposed of by an interference as between the parties, and the Patent Office in practice bases its ultimate action as between the parties upon a determination of who is really entitled to the patent.

[2] No inference of wrongdoing is drawn from the separation of the claims by the individual or his change of position from that indicated in the joint application unless the circumstances indicate falsehood or deceit. These matters enter into the determination of fact as to who is really entitled; and, even where the joint application and the individual application are for exactly the same structure, the rights of the parties are determined from the facts and the patent issues accordingly. In re Application of Crocker, vol. 4, Manuscript Decisions, p. 269, June 5, 1869, and many others, down to Gilbert v. Gilbert & Lindley, C. D. 1910, 211, 1600 G. 775; De Laval Separator Co. v. Vermont Farm Machine Co., 135 Fed. 772, 68 C. C. A. 474.

In the present instance Buck ultimately learned of the claim by Hewlett and the application filed by him. Buck is uncertain in his testimony as to how and just when he learned this. He stated on the trial that it was after certain correspondence, but none was produced, and Buck was finally asked by the General Electric Company to sign a new application for a joint patent for the transmission system but with the particular claims for the insulator eliminated. This he did, and, as was stated by the Examiner in his decision, Buck did acquiesce in Hewlett's claim of invention and would have so testified in the interference proceeding, if he had been called.

It may be assumed that, if Buck and Hewlett were wrongdoers, Buck would have acquiesced, especially as he had assigned his claim to the application. But his attitude is as consistent with innocence as it is with wrongdoing, and no inference can be drawn either way from this fact alone.

The second joint application was directed by the counsel, Mr. Davis, according to his testimony, to be filed as a continuing application, and this counsel also testifies that he instructed his subordinates to mark the first application "abandoned" upon the company's books, and that he so considered it. He was compelled to admit, however, that subsequent thereto steps had been taken to prosecute the first joint application, in the way of answering references cited by the Patent Office, and (even after Steinberger's application had been filed, and after the second joint application by Buck & Hewlett) communications were had with the Patent Office in which the existence and even the furtherance of the first joint application was brought to Mr. Davis' attention, and he took no steps to notify the Patent Office that the first joint application had been abandoned or that the insulator structure had been claimed as a separate invention by Hewlett.

Mr. Davis admitted upon the trial that if any of these acts on his part were likely to mislead the Patent Office, or if he had realized that an incorrect state of facts was inferred from his action, he should have informed the Patent Office of the situation. His explanation is that, as between Buck and Hewlett, he did not consider that any one was interested except Buck and Hewlett, and that he assumed the officials in the Patent Office knew of the applications on file. He also states that certain developments in the transmission system made it seem advisable to file a continuing application, or a new application, based upon the same invention, so far as the joint invention of Buck and Hewlett was concerned, rather than to attempt to patent the new ideas, either as an improvement or as further invention.

With this we have nothing to do, inasmuch as the second joint application of Buck & Hewlett, after comparison with the first joint application, was ultimately found by the Patent Office to be allowable, and the first joint application was ultimately marked "abandoned" by the Patent Office, for lack of prosecution, in November, 1910.

Mr. Davis further admits that he left matters to his subordinates, for which he and his clients were responsible, and which have resulted in the anomalous or contradictory position in which the matter was placed by the fact that the Steinberger application brought in other interests than those of Buck and Hewlett and their assignee, and that careful personal consideration of these matters on his part would have shown to him the danger of creating a wrongful appearance as to his acts and the possibility of an inference by Steinberger that deception or concealment was intended.

Steinberger, after discovering in the summer of 1907 that Hewlett was claiming the invention of the insulator under discussion, looked into the situation and on January 20, 1908, filed his application, in which he describes the construction and use of the water-shedding and moisture-preventing flanges, with full appreciation of the disclosures and invention which he now contends were apparent in his correspondence and from his drawings submitted to Buck at the time the sample disks were ordered by Buck from Steinberger, which were subsequently tested by Hewlett at Schenectady, and in connection

with which the corrugated form of disk was indicated in the drawing, Exhibit 21b.

This brings us to the further contention that the General Electric Company, as assignee, and Hewlett, when claiming to be the sole inventor of the· insulator, are estopped, through having filed the joint application for the same structure, from claiming that a disclosure to Buck was not in fact communicated to Hewlett, or that Hewlett and his assignee were not bound by the disclosures made to Buck, if these appeared in the joint invention as claimed.

[3] The Board of Interference Examiners and the Commissioner of Patents, in reviewing their decision, held that a disclosure to one of two alleged joint inventors was a disclosure to both. They also held that, in the absence of explanation or testimony by Hewlett, it must be presumed that any disclosure to Buck, which appeared in the joint invention, was also a disclosure which would bind Hewlett. This finding was affirmed by the Court of Appeals of the district and is manifestly correct. The Board of Examiners found that the disclosure of Steinberger to Buck did not show and would not teach the invention described in the counts of the interference proceeding. The Commissioner, however, reversed this finding and came to the conclusion that Steinberger's communications to Buck did disclose this invention and necessarily, from his ruling as to the effect of such a disclosure, held that, in the absence of explanation, Hewlett was bound thereby. This last ruling of the Commissioner was also affirmed by the Court of Appeals, and he and they base their conclusion not only upon the failure of Hewlett and Buck to appear and explain or offer testimony on this point but they also base the conclusion upon a patent to Steinberger, No. 913,439, on an application filed November 27, 1905.

Steinberger showed by persuasive testimony that his complete sketch for the purpose of filing this application was made by him at least as early as October 16, 1905, which date would anticipate any date of completed conception by Hewlett. This application was used in this way by the Commissioner for the reason that Steinberger therein states in his specifications that he provides the annular corrugations or ribs upon the under side of the disks in this structure for the purpose of providing increased surface for surface leakage and to facilitate the draining of moisture in certain directions so as to render the moisture harmless. The Commissioner concludes that Steinberger therefore had, as early as October 7, 1905 (the date of sending the sketch 21b to Buck), a complete understanding of all the advantages to be gained by a form of structure which would accomplish these results, through the use of annular flanges, and that, as it is the thing rather than words which he is patenting, he was entitled to the benefit of all such disclosures.

In support of this contention, Steinberger has introduced a number of drawings which have been referred to above, and which were marked Exhibits Y1, Y2, and Y3, which he shows were in existence as early as April, 1904, and in which he indicated the use of such

annular corrugations for the purpose above stated. He then introduced a drawing which was in existence also upon October 16, 1905, and which has been called Exhibit Y5, which is substantially identical in design with the drawings and specifications of the Steinberger patent, No. 904,370, which was then put into interference and in which the counts of the interference proceeding were allowed to Steinberger by the decision of the Commissioner and as affirmed by the Court of Appeals.

[4] Upon the question of priority, therefore, it is evident that Steinberger's drawing Y5 places the formation of the concept of the patent in suit in his mind and, as reproduced upon paper and shown to his business associates, at a date earlier than any date which can be successfully claimed by Hewlett or Buck.

The Examiner, as well as the Board of Examiners, the Commissioner, and the Court of Appeals, however, have all held that the mere concept, as exemplified in a drawing not followed by application, would not prevent the issuance of a patent to Hewlett, if Hewlett reached the same conception and first made use thereof, with an application to the Patent Office for a patent, before Steinberger's application was filed. Christie v. Seybold, 55 Fed. 69, 5 C. C. A. 33.

It is shown that Hewlett made use of his conception in the joint application of Buck & Hewlett in the spring of 1906, made commercial use thereof in the fall of 1906, and in the spring of 1907 filed his individual application in the Patent Office.

[5] It appears that Hewlett referred to the joint application of himself and Buck, as filed in the Patent Office, to show earlier date of invention, when reference was made by the Patent Office to Steinberger's patent, No. 859,703, for which the application was filed May 1, 1906. While Steinberger strenuously objects to any use by Hewlett of the joint application of Buck & Hewlett, which was later repudiated by Hewlett's individual application, nevertheless it must be held that the existence of the papers can be used to fix the date at which Hewlett had a full understanding of the matters disclosed, in determining the question of priority of invention, as compared with Steinberger's patent, No. 859,703. And it must also be held that the disclosures of Steinberger's patent, No. 859,703, do not show any reduction to practice by Steinberger of the invention contained in the drawing Y5 any more than this invention was disclosed by the corrugated disk described to Buck in the drawing Exhibit 24b. On the other hand, it must be held that the filing of a joint application, ultimately determined to be void, as not the joint invention of the parties, would be of little avail in attempting to show diligence in reduction to practice.

But to return to patent No. 913,439, which the Commissioner held showed application by Steinberger of the principles disclosed in the drawing Y5, it is evident that the Commissioner was mistaken. This insulator is a pin insulator, designed and described for use in a vertical position. It shows no more use of the principles under consideration in the counts of the interference proceeding than do a number of the patents of the prior art, such as McCarthy, No. 756,181, Warner, No.

593,625, and the old glass or porcelain pin insulator with the protecting hood or skirt in an annular form around the means of support.

As a matter of fact, Steinberger, as late as May 1, 1906, in applying for patent No. 859,703, as well as in the application for patent No. 913,439, indicates by the description used in his specification that he had failed to appreciate the advantage and value of the concept disclosed in the drawing Y5, and this concept remained unappreciated by him until the summer of June, 1907, when brought to a realization thereof by public description of the Hewlett insulator. Up to that time as well, he had made no use or disclosure of any thing or structure embodying this concept.

We have therefore a concept by Steinberger in October, 1905, not acted upon or disclosed by him in such a way as to be available for his benefit until January, 1908, as opposed to a concept, completed in Hewlett's mind and reduced to paper on November 17, 1905, and worked out in the form of an experimental model at about the same time, or shortly thereafter, and followed by use in a joint application in February, 1906, and in an individual application on April 20, 1907.

The defendant has called attention to the contradictions and indefiniteness in Hewlett's testimony, the lack of memory and failure to produce drawings and letters by Buck, coupled with the circumstances attending Mr. Davis' handling of the various proceedings in the Patent Office, as proof that the evidence on behalf of the plaintiff herein is not worthy of belief. He has referred to the requests by Buck of Steinberger for drawings of all Steinberger's types of insulators and to the procuring of insulators from Steinberger for the purpose of experiment, as well as to an inquiry from the General Electric Company of Steinberger as to the cost of 10,000 insulators of the disk type, to prove bad faith on the part of Buck and the General Electric Company.

The request for prices, although it was not followed by any order, would seem to indicate an attempt to obtain information as to mercantile competition or cost rather than as having any bearing upon the question of invention, and all of the arguments on these points by the defense are summed up in the proposition that a situation indicating bad faith or fraud or responsibility for the effect of the disclosure to one of two joint inventors is of itself sufficient proof, in the absence of explanation, for a finding by the court against the plaintiff, without actual proof of the mental conditions indicated thereby. Such prima facie evidence of wrongdoing, unless explained, would justify the court in resolving all doubts against the party failing to explain and would be a basis for a conclusion that the party failing to explain could give no testimony to rebut the presumption. The application of this principle was made by the Commissioner of Patents and the Court of Appeals to the failure of Hewlett or Buck and the General Electric Company to offer the evidence of either Hewlett or Buck during the interference proceedings, and the defendant seeks to draw a like inference from the fact that Mr. Bartlett, who was Mr. Davis' assistant in the proceedings before the Patent Office, was not called upon the present trial.

If Mr. Bartlett's testimony could be held to be necessary to explain anything left in doubt upon the testimony of Mr. Davis, such an inference would be justified. But upon the present trial evidence to rebut these presumptions has been presented. It is incorrect to assume that a presumption, even if so strong as to be conclusive when uncontradicted, cannot be disproved by affirmative evidence. In spite of the multitude of matters needing explanation in order to justify the plaintiffs' position in the present action, it must be held that upon the entire case these points have been met as has been indicated in this opinion. Upon the question of priority, Hewlett has been shown to be entitled to the issuance of a patent containing claims based upon the counts of the interference proceeding, as modified or limited, so as not to include a unitary disk insulator with mere nonrain-shedding annular corrugations or with annular corrugations at right angles to the plane of the disk.

As to the question of originality, it must be held that Hewlett was the original inventor as to the claims considered allowable by the Patent Office in his application, and as to the question of alleged forfeiture, through the proceedings in the Patent Office and upon the joint application of Buck & Hewlett, the present record has shown that such forfeiture has not been established and that the plaintiffs are entitled to a decree.

## Modification of Opinion.

[5] In considering the decree in the above-entitled matter, the attention of the court has been called to the provisions of section 4918, R. S. (U. S. Comp. St. 1901, p. 3394). It appears that an application to have any claims of the Steinberger patent, No. 904,370, as issued, declared void or invalid must be brought under this section, and that further action by the Patent Office against the Steinberger patent is precluded by the wording of this statute. The suit which has been tried under section 4915 determines merely the rights of the parties with respect to the questions passed upon by the Commissioner of Patents in the interference proceedings. This was done in spite of the fact that a patent "had been inadvertently issued to Steinberger."

The interference proceedings were instituted by the Patent Office and participated in by Steinberger, Hewlett, and the General Electric Company, but the Steinberger patent was left of record and still exists as it was then recognized.

This court has found that the claims of the Steinberger patent, as put into interference and as interpreted by Steinberger, were broad enough in language to cover flanges which might be called "corrugations" upon a disk insulator, if nothing but the shape and size of the flanges was being considered. This interpretation seems to be in accord with the decision of the Commissioner of Patents and of the Circuit Court of Appeals. The Board of Examiners, however, had discussed the language of the Steinberger claims at some length, and particularly with respect to the claim of invention by combining a disk with flanges and a central mass of insulating material. As was said by the board, the form of those projections is not in any way related to the anchoring of the supports in the material of the disks.

They therefore found that a broad interpretation, based upon the ability to read these patents upon any kind of a structure made in the form of flanges or corrugations on a disk, could not be supported. Nor did they agree with Hewlett that the claims of the interference should be so narrowly read as to exclude every structure upon which could be read the language of claim 2 of the later Steinberger patent, No. 913,439, as follows:

"A disk insulator, comprising a disk of insulating material and provided with two faces, and further provided with annular corrugations upon both of said faces, said disk being further provided with means whereby it may be mounted."

They limited the latter claim to a structure which could be directly identified as having "annular corrugations" upon the disks of a pin insulator and not as being a unitary arrangement of annular flanges or collars, in connection with the hub and disk, as disclosed by the claims in interference.

The Examiners distinguished between "corrugations" and "flanges," when viewed from the standpoint of the disclosures and specifications of the Steinberger application, as presented in the interference record. The Commissioner of Patents and the Court of Appeals, however, decided that invention could not be based upon mere matters of enlargement or questions of degree. They therefore came to the conclusion that annular corrugations were the equivalent of annular flanges, even though the arrangement of parts and use of the device made it impossible to exchange one for the other.

This court in its opinion just rendered held that the patentable invention (which was exactly that upheld by the Examiner and by the Board of Examiners on appeal) lay in the use of annular flanges, which would accomplish water-shedding and insulating area-protecting purposes, under the conditions described in the drawings and specifications of the applicants.

It appears that not only was the form of a disk insulator old but the sketch of August 17, 1905, which is earlier than any established conception by Steinberger as to the patent in suit, shows a drawing, partly made by Buck and partly made by Hewlett, of a disk insulator containing everything of the Steinberger disclosure except the addition of corrugations.

Because of all the foregoing, this court held (upon pages 702 and 703 of its opinion) that the claims of the Steinberger patent could not be broadly interpreted so as to include the unpatentable form of a disk insulator with mere corrugations; that this was the basis of the action of the Patent Office and had been accepted by both parties to the interference. Upon page 717 the opinion said that Hewlett was entitled to the issuance of a patent containing claims based upon the counts of the interference proceeding as modified or limited so as not to include a unitary disk insulator, with mere nonrain-shedding annular corrugations, or with annular corugations at right angles to the plane of the disk.

It might have been added to the previous opinion that the presence of obliquely set annular channels around the outer side of the an-

nular flanges or corrugations would in effect produce the oblique angle or rain-shedding qualities sought and employed in the patentable structure. Such channels would seem to make it impossible to describe the flanges as corrugations but might allow the use of diametrically opposite flanges or right-angle flanges such as those illustrated by the witness Day. But whatever be the interpretation of the allowed claims, or whatever may be the proper method to establish that which is patentable thereunder, the language of the claim must be held limited to the patentable invention specified and defined on page 717 of the opinion.

With this modification and statement of interpretation, it will be seen that if read strictly upon the claims of the interference proceeding, as those claims must be read by both Steinberger and Hewlett, in order to make out any valid invention, the claims of the interference proceeding may be allowed to stand so as to avoid conflict between the remedies provided by section 4915 and section 4918, R. S., and the questions may be completely disposed of upon the present trial without action by the Patent Office in the form of modification or amendment of the claims of the patent to be issued to Hewlett from the counts of the interference proceeding.