COTTO-WAXO CHEMICAL CO. v. PEROLIN CO. OF AMERICA.‡

(Circuit Court of Appeals, Eighth Circuit. February 15, 1911.)

No. 3,353.

1. PATENTS (§ 168*)—CONSTRUCTION OF CLAIMS—PROCEEDINGS IN PATENT OFFICE.

A claim in a patent as allowed must be read and interpreted with reference to claims that have been rejected and to the prior state of the art, and cannot be so construed as to cover either what was rejected by the Patent Office or disclosed by prior devices.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 243½, 244; Dec. Dig. § 168.*]

2. PATENTS (§ 172*)—CONSTRUCTION—PROCEEDINGS IN PATENT OFFICE.

The liberal construction allowed to pioneer inventions cannot be invoked in favor of a patentee whose claim was limited to save it from anticipation by previous patents, so as to broaden the claim and practically make it cover what was rejected by the Patent Office.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 247; Dec. Dig. § 172.*]

3. PATENTS (§ 168*)—CONSTRUCTION—PROCEEDINGS IN PATENT OFFICE.

Where a patentee on the rejection of his application inserts limitations and restrictions for the purpose of obtaining his patent, he cannot, after

he has obtained it, claim that it shall be construed as it would have been construed if such limitations and restrictions were not contained in it, nor insist on a construction which will include what he was expressly required to abandon and disavow as a condition of the grant.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 243½, 244; Dec. Dig. § 168.*]

4. PATENTS (§ 328*)—INVENTION—DUST-COLLECTING SUBSTANCE.

The Singer patent, No. 833,423, for processes for making dust collecting or absorbing substances and the products of such processes, which processes consist essentially in drying an absorbent material, as sawdust, and adding thereto a relatively nonvolatile oily substance, is void for lack of novelty and patentable invention in view of the prior art.

Sanborn, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the Eastern District of Missouri.

Suit in equity by the Perolin Company of America against the Cotto-Waxo Chemical Company. Decree for complainant, and defendant appeals. Reversed.

Paul Bakewell, for appellant.

John W. Hill and Chester H. Krum (Hugh K. Wagner, on the brief), for appellee.

Before SANBORN and HOOK, Circuit Judges, and REED, District Judge.

HOOK, Circuit Judge. This was a suit by the Perolin Company of America against the Cotto-Waxo Chemical Company for infringement of patent to Berthold Singer, No. 833,423, dated October 16, 1906, for processes for making dust collecting or absorbing substances and the products of such processes. There was a decree for complainant for an injunction and an accounting, and the defendant appealed.

The claims of the patent alleged to have been infringed are Nos. 1 to 4, 8 to 11, and 13 to 17. They are as follows:

"1. The process of producing dust collecting or absorbing substances which consists in thoroughly drying absorbent material, adding thereto a relatively nonvolatile oily substance having a boiling point above 140° Fahrenheit and commingling the materials."

Claim 2 is the same as 1, with the addition of the words:

"And subsequently permitting the mixture to stand until the said oily substance is practically wholly absorbed."

Claim 3 is similar to 1, with the addition that the oily substance specified is "in such proportion as to fill the pores of the absorbent material without leaving an appreciable quantity of the oily substance on the surface thereof."

"4. The process of producing dust collecting or absorbent substances which consists in thoroughly drying sawdust and adding thereto a relatively nonvolatile oily substance having a boiling point above 140° Fahrenheit in such proportions as to fill the pores thereof without leaving a sufficient quantity of the said oily substance upon the surface of the sawdust particles to stain or spot white paper upon which it is placed for a period of three minutes."

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

"8. The process of producing dust collecting or absorbing substances which consists in drying sawdust and adding thereto a relatively nonvolatile oily substance adapted to form an almost imperceptible permanent film thereon whereby said sawdust is given a permanent affinity for dust and like particles."

Claim 9 is the same as claim 8 as far as the words "adapted to" with the following words added:

"Give the said sawdust particles a permanent affinity for dust and like particles, the proportions of the materials being such that an almost inappreciable film of the said oily substance remains upon the surface of this sawdust, the remainder of said oily substance being wholly absorbed."

"10. The process of producing dust collecting or absorbing substances which consists in drying sawdust and adding kerosene thereto in such proportions that the latter is almost wholly absorbed.

"11. The process of producing dust collecting or absorbing substances which consists in drying sawdust and adding kerosene thereto in such proportions as to fill the pores thereof without leaving a sufficient quantity of the kerosene upon the surface of the sawdust particles to stain or spot white paper upon which it is placed for a period of three minutes."

The other five claims are for the product of the processes described.

In order to appreciate correctly the character and scope of the patent, it is proper to consult the history of its progress through the Patent Office. The rules of law which attend its construction are well settled. A claim in a patent as allowed must be read and interpreted with reference to claims that have been rejected and to the prior state of the art, and cannot be so construed as to cover either what was rejected by the Patent Office or disclosed by prior devices. Hubbell v. United States, 179 U. S. 77, 21 Sup. Ct. 24, 45 L. Ed. 95; Computing Scale Co. v. Automatic Scale Co., 204 U. S. 609, 27 Sup. Ct. 307, 51 L. Ed. 645. The liberal construction allowed to pioneer inventions cannot be invoked in behalf of a patentee whose claim was limited to save it from anticipation by previous patents so as to broaden the claim and practically make it cover what was rejected by the Patent Office. Royer v. Coupe, 146 U. S. 524, 532, 13 Sup. Ct. 166, 36 L. Ed. 1073; Phœnix Castor Co. v. Spiegel, 133 U. S. 360, 368, 10 Sup. Ct. 409, 33 L. Ed. 663. Where a patentee on the rejection of his application inserts limitations and restrictions for the purpose of obtaining his patent, he cannot after he has obtained it claim that it shall be construed as it would have been construed if such limitations and restrictions were not contained in it. Corbin Cabinet Lock Co. v. Eagle Lock Co., 150 U. S. 40, 14 Sup. Ct. 28, 37 L. Ed. 989; Roemer v. Peddie, 132 U. S. 313, 10 Sup. Ct. 98, 33 L. Ed. 382. He cannot insist upon a construction of his patent which will include what he was expressly required to abandon and disavow as a condition of the grant. Electric Gas Co. v. Boston Electric Co., 139 U. S. 481, 500, 11 Sup. Ct. 586, 35 L. Ed. 250; Sutter v. Robinson, 119 U. S. 530, 7 Sup. Ct. 376, 30 L. Ed. 492.

With this brief review of the law, let us see what was done in the Patent Office, and what the patentee abandoned in order to get his patent.

The first application made by Singer broadly covered the process of adding an oily substance to a stock of dry, macerated, or comminuted and highly absorbent material, their thorough physical mixture,

and the removal of the surface oil from the particles, either by treatment or by absorption into the particles themselves. This was embodied in claims 1 and 2. The third claim specified sawdust as the base material and the addition of sand or its equivalent. There were also two claims for the product. The examiner rejected the claims on reference to patents to Kennedy, No. 685,211, October 22, 1901; to Cheesbrough, No. 755,357, March 22, 1904, and to Sproessig, No. 800,506, September 26, 1905. We do not find these patents in the record. The process claims were canceled by the applicant and four new ones substituted in their places. The noteworthy changes from the canceled claims were in first drying or expelling the moisture from the absorbent material, sawdust for example, before the addition of the oily substance, and in the introduction of a granular material to remove the unabsorbed surface oil from the particles. The applicant claimed he was the first to treat sawdust by drying it before adding the oily substance. The examiner ruled that the claims covered nothing patentable and referred to the patents above cited and to that to Kistenmacher, No. 440,314, November 11, 1890. All the claims were rejected. The patent to Kistenmacher is for improvements in a process of manufacturing granulated material for use in cleaning carpets. They consist in first washing the sawdust; second, partly drying it; and, third, causing it to take up a sufficient amount of volatile solvent such as benzine or gasoline. The use of water and partial drying is said to effect an economy in the use of the solvent and to keep it at the surface of the sawdust particles where it performs its functions. Kistenmacher also said in his specifications:

"I have discovered by long-continued experiment that, where the benzine is applied directly to dry sawdust, a much larger quantity of benzine will be required for a given volume of sawdust than would be required if the sawdust were first washed or boiled in water."

It appears, therefore, that the relative values of dry and partly dry absorbent material had been considered in the art before Singer entered the field. Singer made a slight change in one of his claims and reasserted them, saying his process and Kistenmacher's were exact opposites. The examiner again rejected them, and called attention to the above quotation from Kistenmacher's specifications. It was not invention by Singer to adopt what Kistenmacher rejected on grounds of economy. Singer canceled his claims then amounting to seven and proposed nine new ones, the first seven being for the process. Claim 1 was:

"The process of producing dust collecting or absorbing substances which consists in thoroughly eliminating moisture from absorbent material, adding an oily substance thereto and thoroughly commingling the materials."

The other process claims were variations of the above similar to those in the prior applications excepting that in three of them the approximate proportions of the materials were stated as being 75 per cent. of sawdust and 25 per cent. of oily substance.

The new claims were supported by affidavits concerning the prior art and experiments with products under other patents. The examiner replied that the Patent Office had twice called the attention of the

applicant to the Kistenmacher patent, and that his mention of the drying of the sawdust should be regarded as a publication. Singer then claimed his process was distinguishable, in that he specified an oily substance while Kistenmacher used benzine which was not of that character. Singer also added three more claims. The examiner ruled that benzine was generally regarded as an oil, and rejected all the claims. Singer accepted the ruling and amended his application by inserting twelve new process claims and two for the product described, which after some adverse rulings were changed and increased to five. The patent was then allowed. It is important to notice how Singer narrowed his latest claims to comply with the rulings of the Patent Office. He had been denied a broad claim for a dust-collecting material; also for the use broadly of oils or oily substances because the volatile oils of Kistenmacher were included therein. It had been ruled that it was not novel to use sawdust nor to dry the sawdust or other absorbent, nor to use a volatile oil such as benzine or gasoline. So in seven of his last process claims Singer specified "a relatively nonvolatile oily substance having a boiling point above 140° F.," in two he specified "a relatively nonvolatile oily substance" and in the remaining three "kerosene." In the end he got his patent, but only by adopting as an element an oil or oily substance of a relatively nonvolatile character, and he so escaped the Kistenmacher patent.

There are several British patents on dust-collecting processes and substances which do not appear to have been before the Patent Office, and which clearly show not only that Singer's supposed distinguishing feature was old, but also that there was nothing new in the claims which had been rejected. The patent to Rosenfeld, No. 21,471, October 1, 1901, is for an improved dust-absorbent material for use in brushing floors and the like. It specifically mentions vulcan oil, and generally the admixture of oils or fats of any kind or oily or fatty substances with various kinds of absorbent materials, sawdust among them, in varying proportions. The patent to Fischer, No. 6,725, April 21, 1904, also specifies the use of sawdust and "oil or fat." Fischer speaks of the retention of the particles of dust by the oil coating. In the patent to Bauer, No. 16,679, June 22, 1905, mineral oil, stearine, beeswax, and sawdust are combined with other materials for a dust-laying composition for use when floors, carpets, etc., are swept.

Obviously the thing desired by every one who had to do with the art was to secure a dust absorbent for floors, carpeted or otherwise, which did not stain or soil the surface upon which the material was placed for sweeping. It was not invention to determine the relative quantity of oil which the particular base material would absorb. That would naturally differ with different absorbent materials, and it would not even be the same with different kinds of sawdust. Relatively nonvolatile oils or fatty substances were clearly and definitely mentioned in the prior patents above referred to. Sawdust is frequently mentioned in them as a base substance and oil or fat as the element to be combined therewith. We think that, if the patents mentioned had been called to the attention of the Patent Office, the patent in suit

would not have been issued even in the narrow form to which it was finally reduced.

The decree of the Circuit Court is reversed and the case is remanded, with direction to dismiss complainant's bill.

SANBORN, Circuit Judge (dissenting). While acquiescence in the rejection of claims on references in the Patent Office and the acceptance of a patent on amended claims estops the patentee from maintaining that the amended claims secure to him a monopoly of the use of the devices shown in the references, that is the limit of the estoppel. He is not estopped thereby from securing by amended claims every novel and useful device, composition, and process that he has discovered or invented that is not disclosed by those references. National Hollow Brake Beam Co. v. Interchangeable Brake Beam Co., 106 Fed. 693, 713, 714, 45 C. C. A. 544, 566, 565. A patentee never acquiesces in the rejection of a claim which he immediately reasserts in the form of an amended claim and successfully secures by a patent where the device of that claim is not shown in the references cited.

The references specified in the Patent Office were to the patents to Kennedy, No. 685,211, October 22, 1901; to Cheesbrough, No. 755,-357, March 22, 1904; to Sproessig, No. 800,506, September 26, 1905; and to Kistenmacher, No. 440,314, November 11, 1890. Typical claims of the patent for the process and the product respectively which the patentee never acquiesced in the rejection of and finally secured by his patent are:

"8. The process of producing dust collecting or absorbing substances which consists in drying sawdust and adding thereto a relatively nonvolatile oily substance adapted to form an almost imperceptible film thereon whereby said sawdust is given a permanent affinity for dust and like particles."

"16. The herein described product consisting of comminuted absorbent material permanently impregnated with a relatively nonvolatile oily substance, the surface of said absorbent material having a glassy or glazy appearance and being free from globules or particles of the said oily substance, and said material being free from any constituent or ingredient capable in the finished product of smearing, staining, or soiling fabrics upon which it is used."

The object which the patentee sought to attain was a granular product, light in weight, free from aqueous moisture, filled with nonvolatile oil so completely absorbed that it would be dry, and free from globules of oil, and would attract and hold the particles of dust to its oil glazed surfaces when it was sprinkled upon and swept from floors, carpets, and more delicate fabrics without staining or soiling them. Such a product and such a method of making it Singer invented and secured by this patent. The principle of his invention was the use (1) of sawdust or another similar absorbent, (2) from which all aqueous moisture had been expelled so that it was capable of receiving nonvolative oil to the full extent of its absorbing capacity, and (3) a nonvolatile oil so completely absorbed that the absorbent material should be covered with a glassy film, and should be free from globules of oil so that it would not stain or soil delicate fabrics when sprinkled upon and swept from them. What was there in the references in the Patent Office to limit or anticipate the claims of the patent which secured to Singer this process and product? On this record there was

certainly nothing in the patents to Kennedy, to Cheesbrough, and to Sproessig, for the appellant-defendant did not put these patents in evidence, and the patented claims to Singer which have been recited remained a demonstration in the absence of proof of the patents referred to that the patentee never acquiesced in the rejection of any claim to his process or his product that was either limited or anticipated by those references. Not only this, but, while these references are absent from the record, there is testimony in the record that they were of such a character that they neither limited nor anticipated the claims of this patent to Singer. These references may therefore be dismissed.

The patent to Kistenmacher is before us, and seems to be the one upon which counsel for the defendant-appellant much rely. Kistenmacher says in his specification that his "invention relates to a certain process of preparing sawdust by saturating it with a volatile solvent—such as benzine or gasoline—and it has for its object to economize the use of said solvent by causing it only to be absorbed by the surface of the individual grains of sawdust (in which position alone it is effective), and I obtain this result by first washing the sawdust in water and in then partially drying it whereby the interior of the several grains are left moist, the exterior thereof alone being dry, and in then causing the dry exterior to take up the volatile solvent. * * * By this washing, soaking, or boiling operation the sawdust absorbs a larger percentage of water, and upon the application of the benzine, said benzine will not be so quickly absorbed." The principle of Singer's invention was the perfect absorption by the sawdust of the largest possible amount of nonvolatile oil, to the end that the oil would never evaporate or volatilize, but would remain permanently in the product, so that it would be susceptible to shipment and to storage for months, and would still remain effective and merchantable. The principle of Kistenmacher's invention was the prevention of the absorption of the volatile oil he used by the sawdust by first saturating the latter with water so that the least possible amount of the volatile oil would be absorbed by the surface only of the particles of sawdust, and the object of his invention was to save benzine. Singer's process was thoroughly to dry his sawdust, and then to cause it to absorb completely the largest amount of nonvolatile oil it was capable of receiving. The process of Kistenmacher was thoroughly to soak and wet with water his sawdust, and to dry the surface of its grains only so that they would absorb the least possible amount of nonvolatile oil, and then to mix them with that kind of oil. The principles of the two inventions were diametrically opposed. The objects sought by them were radically different. The means used, the thorough drying of the sawdust and the nonvolatile oil of Singer, and the water-soaked sawdust dry on the surface of the particles only and the volatile oil of Kistenmacher, differed radically in themselves and in their necessary effects and necessarily manufactured radically different products, for water-soaked sawdust mixed with a volatile oil could not long have retained, if it ever really had, any effective or merchantable quality as a dust collector, because the volatile oil on the surface of the grains of sawdust not capable of penetrating and being absorbed by them

185 F.—18

on account of the water therein would necessarily evaporate in a very few moments, while the dry sawdust of Singer subsequently thoroughly saturated with relatively nonvolatile oil so that the surfaces of the grains were glazed therewith, would permanently retain their dust-collecting attributes and remain merchantable and effective. It was doubtless in view of these facts that the expert examiners in the Patent Office, although they had cited the Kistenmacher patent, concluded on final examination that it neither anticipated nor limited the claims of Singer which have been recited, and passed them to patent as they did. In my opinion that decision was right because in principle, in object, in means, in process, and in product the invention of Singer radically differed from and was the opposite of that of Kistenmacher.

Was this process or product of Singer anticipated by the British patents to Rosenfeld, No. 21,471, October 1, 1901, to Fischer, No. 6,725, April 25, 1904, or to Bauer, No. 16,679, June 22, 1905, which were not referred to in the Patent Office, but were presented at the hearing below?

The patent to Rosenfeld describes the process of making a dust absorbent "for use in brushing floors and sweeping pavements of all kinds." He declares that the preferred mixtures are: First, "100 parts by weight of fine dry sand and 5 parts of vulcan oil or some other fatty matter"; second, "100 parts by weight peat or wood shavings and 8 to 10 parts by weight vulcan oil"; third, "94 parts cement, 6 parts asphaltum or bituminous earth and 22 parts oil." The process of manufacturing this mixture is thus described in the provisional specification:

"The vulcan oil is poured into a vessel and constantly stirred and the pulverized cement is gradually added in suitable quantities until the above-mentioned proportion has been reached. As a result of the stirring the materials first form an even paste which then gradually turns into a greasy granular mass."

Evidently Rosenfeld had never conceived the process or the product of Singer, a product filled with nonvolatile oil so completely absorbed that no globules of oil remained upon the surfaces of the grains, but those surfaces are glazed over so that the product will not soil carpets and more delicate fabrics. Because Rosenfeld did not describe or use the same or equivalent means and did not make the same or an equivalent product, it seems to me that he did not anticipate the process or the product of Singer. He failed to perceive or to write that a thoroughly dried material with the maximum capacity to absorb oil and a complete absorption of the oil therein so that no globules would remain on the surface of the grains and the product would not be greasy were indispensable to a permanently merchantable product that could be used on delicate fabrics without soiling or smearing them. The truth is he was not seeking, he did not discover, and he did not claim to have discovered any such product or any method of making it. He was seeking to discover and make a product that might be used on floors and pavements which would not be injured by grease, or oil, or fat. His product was a greasy granular mass usable in sweeping such floors and pavements, but useless for the purpose

of Singer, the collection of dust from and the cleansing of carpets and delicate fabrics, the smearing or soiling of which with oil or grease would injure and perhaps destroy.

The invention of Fischer was a mixture of sand, infusorial earths, sawdust, and like substances, which do not saponify oils or fats with "a hygroscopic substance" such as ground chloride of magnesium or chloride of calcium "in a finely divided or liquid form" with or without the addition of oil or fat. The invention was the mixture of the hygroscopic substance with the other materials. And because Singer did not claim, describe, or use that hygroscopic substance as one of the ingredients of his mixture, and Fischer insisted that any mixture without that substance lacked the efficiency of his product, and because Fischer failed to describe or claim the thorough drying of the sawdust or other absorbent, the complete absorption of the oil and the glassy surface of the grains which made the product of Singer efficient and permanently merchantable and prevented it from smearing or soiling delicate fabrics, the process and the product of Fischer do not seem to me to have been the equivalents of those of Singer, and I think they fail to anticipate them.

The patent to Bauer, No. 16,679, secures a dust-laying composition and the process of manufacturing it. The ingredients of the composition are stated in the specification to be 400 grammes of stearine, 100 grammes of beeswax, 3 litres of mineral oil. 25 kg. 500 gr. of perfectly dry river sand, 2 kg. 500 gr. of sawdust from fir tree wood and 500 gr. of English or Venetian red, and the process of manufacture consists in melting the stearine and beeswax by the application of heat. the addition of the oil, the boiling of this mixture, the subsequent addition of the sand. sawdust, and Venetian red, and the thorough admixture of all these ingredients. Neither comment nor reflection may present a more conclusive demonstration than the reading of the description of the ingredients and the method of manufacture of this mixture that this composition and the process of making it neither anticipate nor suggest the simple and effective method and composition of Singer. And here ends the review of the patents that are claimed to anticipate that of Singer. It is a settled rule for the construction of patents that the interpretation which sustains and vitalizes them should be preferred to that which strikes down and paralyzes them. Singer's invention may not be a great or a pioneer one. That invention and the prior art present one of those cases in which several inventors produce by different processes different compositions which collect dust with varying degrees of operative success. Under such circumstances, each inventor is entitled to his own method and composition so long as they differ from those of his competitors, and do not include theirs. Railway Company v. Sayles, 97 U. S. 554, 556, 24 L. Ed. 1053; McCormick v. Talcott, 20 How. 402, 405, 15 L. Ed. 930.

The expert examiners in the Patent Office and the Commissioner of Patents, after repeated consideration and reflection concerning the claims of this patent. were finally of the opinion that the process and the product of Singer described in the specification and claims of this patent fell under this rule of law and they issued to him the lawful

grant of a monopoly of their use. The Circuit Court examined the evidence in the record in hand and reached the same conclusion, and I am unable to concur with the majority of this court in the view that they were wrong. In my opinion the patent should be sustained.