HOSKINS MFG. CO. v. GENERAL ELECTRIC CO.

(District Court, N. D. Illinois, E. D. November 10, 1913. On Reargument, April 15, 1914.)

No. 30,262.

1. PATENTS (§ 172*)—CONSTRUCTION OF CLAIMS—CHANGES MADE IN PATENT OFFICE.

Changes of expression in the claims in an application for a patent, made to overcome the examiner's objections, which do not substantially change the meaning, will not defeat a meritorious patent, and it is entitled to a fair construction of the claims as allowed.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 247; Dec. Dig. § 172.*]

2. PATENTS (§ 172*)—CONSTRUCTION—EFFECT OF CANCELLATION OF CLAIMS.

Patent claims must be read and interpreted with reference to claims which have been rejected by the Patent Office and to the prior art, and

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

cannot be construed to cover either what was canceled by the patentee or disclosed by prior devises or publications.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 247; Dec. Dig. § 172.*]

3. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—ELECTRIC RESISTANCE ELEMENT.

The Marsh patent, No. 811,859, for an electric resistance element or material consisting of an alloy of nickel and a metal of the chromium group, was not anticipated and is valid; also *held* infringed by an alloy of the same metals, with the addition of iron and manganese in such small quantities as not to affect it as a resistance element.

4. WORDS AND PHRASES—"MATERIAL"—"ELEMENT."

As used in the phrases "electric resistance material" and "electric. resistance element," the words "material" and "element" are synonymous.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 5, p. 4404.]

5. WORDS AND PHRASES—"CONSIST"—"COMPRISE."

The word "consist" is a more specific term than "comprise," as it means to stand together, to be composed of or made up of, while "comprise" means comprehend, include, contain, embrace; but the terms "consisting of a strip" and "comprising a strip," as used in a patent claim, are synonymous.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 2, p. 1450; vol. 2, p. 1374.]

6. WORDS AND PHRASES—"FORMED OF"—"COMPOSED OF."

"Formed of" and "composed of" are synonymous; they both mean consisting of.

On Reargument.

7. PATENTS (§ 165*)—SCOPE—UNDISCLOSED USES OR PROPERTIES OF INVENTION.

A patentee is entitled to all uses and properties of his discovery, whether known or disclosed or not.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 241; Dec. Dig. § 165.*]

8. PATENTS (§ 314*)—SUIT FOR INFRINGEMENT—EVIDENCE.

Ex parte tests of electrical resistance materials to determine their similarity in the properties of resistance and durability under high temperatures, apparently fairly made, if not objected to on the hearing, may properly be considered on a question of infringement.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 550–553; Dec. Dig. § 314.*]

In Equity. Suit by the Hoskins Manufacturing Company against the General Electric Company. On final hearing. Decree for complainant.

Dyrenforth, Lee, Critton & Wiles, of Chicago, Ill., for complainant.
Charles Neave and Clarence D. Kerr, both of New York City, and Frank J. Seabolt, of Schenectady, N. Y., for defendant.

SANBORN, District Judge. Infringement suit on patent No. 811,-859, to Albert L. Marsh, assignor of the plaintiff, applied for March 15, 1905, and issued February 6, 1906. The defenses are that the patent is invalid for anticipation, and in any event not infringed. Defendant claims that the patent is not meritorious, and contributed nothing to what previously existed, and is entitled to no consideration

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

from any point of view. On the other hand, plaintiff claims that the patentee discovered that an electrical resistance element or material composed of nickel and chromium in certain proportions is suitable for all-around use in the various situations in which electrical resistances are desirable for rheostats, electric heaters, toasters, cookers, soldering irons, flatirons, etc. Plaintiff's material may be called the "Marsh resistor," and defendant's bears the name of "calorite." The great benefit claimed for these two materials is their extraordinary durability, as compared with the prior art. They have more than 70 times the resistance of copper, and twice that of nickel, copper alloy, and more than 150 times the durability of anything known in the prior art.

The case presents some rather unusual features, particularly the action of the Patent Office in rejecting claims afterwards allowed, the character of the Placet disclosure, and the fact that almost the sole utility of Marsh's discovery resides in the quality of durability, apparently unknown to him at the time he received his patent. The patentee thus describes his alleged discovery:

"My object is to provide, as an improved electric resistance material, a metal which has the property of being particularly low in electric conductivity, has a melting point exceeding that of pure copper, and may be drawn or otherwise shaped to form particularly durable, efficient, and desirable strips, strands, or filaments suitable for use in the various connections where electric resistances are desirable. I have discovered that the metals of what is termed the 'chromium group,' particularly when mixed with nickel, form an alloy having the properties of being very low in electric conductivity, very infusible, nonoxidizable to a very high degree, tough and sufficiently ductile to permit drawing or shaping it into wire or strip form to render it convenient for use as an electric resistance element. * * * These metals are chromium, molybdenum, tungsten, and uranium. Any one of these metals is suitable for my purpose, though for various reasons I prefer to employ chromium. * * * As the above metals possess characteristics in common which adapt them to my purpose, any one of them may be employed, though when alloyed with nickel or cobalt, for example, proportions may vary to produce the best electric resistances, taking into consideration the necessary toughness and degree of ductility desirable for the particular purpose in hand. I have found, for example, that an alloy consisting of 90 per cent. nickel and 10 per cent. commercially pure chromium may be drawn into a fine wire and annealed, producing a tough metal having a melting point exceeding that of pure copper and with an electric resistance approximating 50 times that of pure copper. Its temperature coefficient is particularly low, it does not become crystalline and brittle under heating and cooling, it resists oxidation to a remarkable degree under very high temperature, and likewise keeps a polish under all atmospheric conditions, even where corrosive fumes are present.

"Any metal of the chromium group possesses desirable qualities for electric resistance material, whether employed alone or alloyed with nickel or cobalt. At the present time I am of opinion that the most practical and desirable electric resistance material may be formed of an alloy of nickel and chromium in suitable proportion, drawn into strips, strands, or filaments and annealed. In its broadest sense, however, my invention is not to be limited to an alloy of the last-named metals.

"The accompanying drawing shows a rheostat of a well-known type, in which the coiled wires $a$ are resistance elements formed of a metal alloy, consisting of less than 50 per cent. of a metal of the chromium group and more than 50 per cent. of nickel or cobalt, or both. In practice I prefer, mainly for commercial reasons, to form the alloy preferably less than 25 per cent. chromium and more than 75 per cent. nickel. Variations in the relative proportions of the metals would affect more or less the variations in strength,

durability, and resistivity of the alloy. It may be stated, for example, that a metal alloy consisting of 15 per cent. chromium and 85 per cent. nickel drawn into a wire .016 of an inch in diameter has a resistance approximating 2.3 ohms per foot.

"As stated before, either nickel or cobalt is suitable for my purpose, when alloyed with a metal of the chromium group in a proportion of more than 50 per cent. nickel or cobalt, or both, and less than 50 per cent. chromium or the like. Nickel and cobalt alloy readily with metals of the chromium group and resist oxidation to a high degree. Iron, on the other hand, is readily oxidizable and will not answer my purpose when alloyed with a metal of the chromium group. Where I mention in the claims a metal having the properties of nickel or cobalt, I wish to designate only the metals nickel and cobalt, which have properties that are the same for my purpose, but which cannot both be classed under any single term of which I am aware."

The patent is not directed specifically to the use of resistance elements for electric heaters or cookers, but rather to a resistance element or material for any and every purpose for which such elements may be used. The only drawing accompanying the patent shows a rheostat, whose purpose is to throttle the electric current. Such resistances are commonly used in street cars, and other locations where it is desired to start up motors and cut down the current while the motor is being started. The patent is designed for resistances for such uses as much as for any other.

It turns out, however, to the surprise of the patentee as much as anybody, that the Marsh resistor is peculiarly adapted to those situations where very high temperature is required, 1,000 degrees centigrade or more, where prior devices were so short-lived as to be of comparatively little use. Both plaintiff's and defendant's material will last 400 hours or more at the temperature mentioned; and it is this feature which gives them their very great value and utility. Defendant's material, called calorite, is substantially the same as plaintiff's, except that it is a quarternary alloy of four substances, nickel, chromium, iron, and manganese, while plaintiff's is a binary alloy, composed of nickel and chromium only.

Shortly after the patent was issued a sample of the Marsh resistor was sent to defendant, and a proposal made to sell the patent for $75,000, or give a perpetual license, under rather onerous terms. Defendant obtained a copy of the patent, and also directed that the prior art be examined, whereupon the British patent of Placet, of 1896, was discovered. This patent was regarded by defendant as being a complete anticipation of Marsh, and for that and other reasons it did not purchase or take any license from him or his assignee. Defendant has a thoroughly equipped laboratory, in which it has produced some very remarkable results, and at once instituted a series of experiments to obtain a resistance element which should be as durable, and as good or better in all respects, as the Marsh material. It succeeded in producing calorite, which is substantially the same as Marsh's material, except that it contains a small amount of iron and manganese. It is impossible to tell them apart, except by chemical analysis. They look alike, they have the same color, they last the same length of time under use, and they have the same resistance, the same melting point, and the same temperature coefficient of resistance. If the patent is

valid, therefore, it is infringed, and the only questions are whether Marsh gave up his invention by canceling claims in the Patent Office, and whether his discovery was anticipated by the prior art.

*The File Wrapper.* The only substantial changes which Marsh made in his journey through the Patent Office were to change the word "material" in his claim to the word "element," and to give up all claim to an electric resistance material or element of which one constituent part was chromium, or one of the metals of that group. The following shows substantially what occurred in the Patent Office:

Claims Absolutely Rejected.

1. Electric resistance material comprising an alloy containing one of the metals of the chromium group. (Rejected 5–3–'05.)
1. An electric resistance element formed of a metal alloy containing one of the metals of the chromium group. (Rejected 8–15–'05.)

Claims Rejected in Form but Allowed in Substance.

2. Electric resistance *material* comprising a strip, strand, or filament of an alloy of nickel and one of the metals of the chromium group.
3. Electric resistance *material* comprising an annealed strip, strand, or filament of an alloy of nickel and one of the metals of the chromium group.
4. Electric resistance *material comprising* an alloy of nickel and chromium.

Patent Claims.

1. An electric resistance element composed of a metal alloy consisting of one of the metals of the chromium group, in the proportion of less than 50 per cent. of the element, and more than 50 per cent. of metal having the properties of nickel and cobalt.

2. *An* electric resistance *element* comprising a strip, strand, or filament *formed* of an alloy of nickel and one of the metals of the chromium group.
3. *An* electric resistance *element* comprising an annealed strip, strand, or filament *formed* of an alloy of nickel and one of the metals of the chromium group.
4. *An* electric resistance *element formed of a metal* alloy *consisting* of nickel and chromium.
5. An electric resistance element formed of a metal alloy *consisting* of chromium in the proportion of less than 50 per cent. of the element and nickel in the proportion of more than 50 per cent. of the element.

Defendant takes the position that its calorite is the material defined in the original fourth claim. The argument is that calorite *comprises* an alloy of nickel and chromium, and also iron and manganese. The claim was not limited to nickel and chromium, but only comprised or included them. Hence it is argued that the rejection and erasure of this claim preclude the patentee from claiming again what was so erased by him, and what the defendant now uses.

[1, 2] In this circuit the rule of construction of the file wrapper contents is exceedingly liberal to the patentee. He cannot claim what he definitely abandoned in the Patent Office. The question is: Did he there disclaim the construction he now contends for? Did Marsh ever

yield his claim for the discovery of an improved resistance material or element? He did narrow some of the claims, but did he ever give up this main idea? Changes of expression, having substantially the same meaning, made to overcome the examiner's objections, are not permitted to defeat a meritorious claimant; and he is entitled to a fair construction of his claims as actually granted. Hubbell v. United States, 179 U. S. 77, 21 Sup. Ct. 24, 45 L. Ed. 95. In Gray Telephone Pay Station Co. v. Baird Mfg. Co., 174 Fed. 417, 98 C. C. A. 353, the patentee seemed to have abandoned his basic claim at one time, but continually returned to it, until a narrower one was finally allowed on appeal. Marsh never abandoned his main contention, but did cancel claims for alloys of chromium with other metals not described, and is claimed to have narrowed the fourth claim by substituting the words "formed" and "consisting" for the word "comprised." It is true that patent claims must be read and interpreted with reference to claims which have been rejected and to the prior state of the art, and cannot be construed to cover either what was canceled by the patentee or disclosed by prior devices or publications. Hubbell v. United States, supra; Computing Scale Co. v. Automatic Scale Co., 204 U. S. 609, 27 Sup. Ct. 307, 51 L. Ed. 645; Cotto-Waxo Chemical Co. v. Perolin Co., 185 Fed. 267, 107 C. C. A. 373. The patentee cannot be allowed a construction which will include what he expressly abandoned and disavowed as a condition of the grant. 185 Fed. 267, 269, 107 C. C. A. 373.

[3, 4] The problem, therefore, is whether Marsh, in order to obtain his grant, narrowed original claims 2, 3, and 4 to procure his present claims bearing the same numbers. In claims 2 and 3 he changed "material" to "element" and inserted "formed." Clearly there was no change in sense. "Material" and "element" are in this connection absolutely synonymous. The material of the compound is the metal strip, strand, or filament—the wire—which carries the current and resists it to produce heat and light. So is the element. As defendant's counsel well say:

"I recognize and can think of no difference. * * * An electric resistance element is an electric resistance material, and an electric resistance material is an electric resistance element."

We cannot comprehend (or comprise) the argument of plaintiff's counsel in saying that a claim on a resistance *material* would cover it in all its uses, while a claim on a resistance element would not. The words mean absolutely the same thing. Any other construction would make the "element" claims functional, and might also exclude plaintiff from claiming the hidden use of extraordinary durability now put forward. Still less reason exists for thinking that the added word "formed" was more than a verbal change. "A strip of an alloy of nickel" cannot be any more or less than "a strip *formed* of an alloy of nickel."

The examiner, therefore, both rejected and allowed original claims 2 and 3, and Marsh canceled and claimed both. This leads to the inquiry whether any substantial change was intended to be made in claim 4, both forms of which are here reprinted for greater clearness. Ver-

bal changes only were made in 2 and 3; why not in 4? The possibility, at least, that no substantial change was thought of, is suggested. Regarding, as I do, the Marsh invention as meritorious, I think fairly liberal rules of construction and definition should be applied, especially in view of the Patent Office history.

Original Claim 4. Electric resistance material comprising an alloy of nickel and chromium.

Patent Claim 4. An electric resistance element formed of a metal alloy consisting of nickel and chromium.

[5] The verbal change from "material" to "element" has been considered, but the change from "comprising" to "consisting" is more difficult to explain by similar reasoning. The word "formed," as before, adds nothing but letters. "Element of an alloy" and "element formed of an alloy" are identical. But at first sight "comprise" and "consist" seem to be words of different meaning. The true question, however, is whether they were so regarded by the examiner and by the patentee. Looking at the Century Dictionary, "comprise" means comprehend, include, contain, embrace; as, the German Empire comprises a number of separate states, which is like saying that New England consists of six separate states. "Consist" means to stand together, to be composed of or made up of. It is a more specific term than the other.

[6] Turning now to the context, it will be observed that the claims always use "comprise" with an object in the singular number; "comprising a strip," "comprising an alloy," and also use the word as synonymous with "formed of," as in claims 3, 4, and 5, and in both canceled claims numbered 1, and also as synonymous with "composed of" in patent claim 1. Now "formed of" and "composed of" are the same; they both mean consisting of. "Comprising a strip" and "consisting of a strip" would seem to signify one and the same thing. It would hardly be asserted that "comprising a strip" means two or more strips, or a strip of metal and some other substance.

In view of the whole situation, therefore, it does not seem unreasonable to conclude that no substantial change was intended to be made in the verbal alterations of claim 4, any more than in claims 2 and 3, and I have therefore put claim 4 among those rejected in form but allowed in substance. No reason can be perceived why claim 4 should be changed and not the others. It is true that when a patent applicant changes a claim to avoid a reference, or to meet the examiner's notion of a reference, he usually changes the substance, and in this case Marsh evidently either convinced the examiner that "element" differed from "material," or that his references were inapplicable, when he subsequently allowed the same claims he had previously rejected. Marsh made verbal changes only, and thus succeeded in getting his patent for the identical thing he says in his specification that he wanted.

Defendant asserts that its calorite is made according to rejected claim 4; but this is on the theory that the claim covers nickel, chromium, and other metals. But I do not think that Marsh intended to rigidly restrict his claims to nickel and chromium, so long as nothing but padding is added, nothing which would affect resistance or the

ductility necessary to make the strips, strands, or filaments referred to. He does say that iron must not be used with chromium alone, because it is readily oxidized or burned up, and will not answer his purpose when alloyed with chromium. But this does not imply that it may not be used in small quantity with the nickel and chromium together. It would be excessive refinement to say that a manufacturer may put in 8 per cent. of iron, without changing resistance, melting point, temperature coefficient, or durability, even though improving ductility and perhaps other functions, and thus escape infringement. So long as added metals do not affect the alloy as a resistance element, a fair construction of the claims seems to make such additions only a double use. There is much discussion in the briefs of the question of infringement; but it need not be further discussed here, except to say I think that two compositions of matter in which the same constituent elements predominate are equivalents, when the function or essential properties of each entire composition are substantially the same. Robinson on Patents, § 304; Walker on Patents (4th Ed.) § 369; Tyler v. Boston, 7 Wall. 327, 19 L. Ed. 93.

*The Prior Art.* Legal rules on the question of anticipation are that "anticipating patents and publications must disclose the invention without patentable change or alteration to make them anticipatory." Goodwin Film & Camera Co. v. Eastman Kodak Co. (Aug. 14, 1913; W. D. N. Y.) 207 Fed. 351, citing Waterbury Buckle Co. v. Aston, 183 Fed. 120, 105 C. C. A. 410. As plaintiff's counsel expresses it, the reference—

"must be so clear and definite to enable any mechanic skilled in the art to reach the patented invention certainly, directly, and without the necessity of any experiment, and this rule is enforced with peculiar strictness when the alleged disclosure is found in a foreign patent or publication." Badische Anilin & Soda Fabrik v. Kalle, 104 Fed. 802, 44 C. C. A. 201; Hogan v. Specialty Co. (C. C.) 163 Fed. 289; Hopkins on Patents, 261; Macomber's Fixed Law of Patents (2d Ed.) § 85.

A rather extreme illustration of the strict construction of foreign patents is Western Glass Co. v. Schmertz Wire Glass Co., 185 Fed. 788, 793, 109 C. C. A. 1, in the Circuit Court of Appeals of this circuit, where almost the precise process of the patent was described in an earlier British patent, but held not to be a sufficient disclosure.

Another claim to liberal construction is that plaintiff made an important advance in the practical art of electric resistance material. He has produced an alloy which lasts 150 times as long as anything in the prior art, and defendant has substantially copied it. Under these circumstances, all reasonable presumptions are in plaintiff's favor, as in the Schmertz Case. Schmertz simply improved on an old European process for making wire glass, but he made the art practical, although this old process can now be used to make as good glass, and as cheaply and rapidly, as by the Schmertz process, and that without using anything he discovered. This was decided in a later case between the same parties. 195 Fed. 760, 115 C. C. A. 459.

That the prior art abounds in references to a chromium-nickel alloy as a useful resistance element is not denied; but plaintiff claims the statements in all such references to be so vague as to give no informa-

tion which can be acted on without elaborate experiment. In his British patent of 1896 Placet, who was the first to produce pure chromium in considerable quantities, claims practically all chromium alloys. His best statement is that:

"Chromium increases the electrical resistance of manganese, ferro-manganese, ferro-nickel, and other metals employed in the manufacture of conductors of high electrical resistance."

This must also be taken in connection with two other statements of his, to the effect that chromium is most frequently employed in the proportions of from five-tenths to 15 or 20 per cent., but that alloys containing larger amounts are so hard that they cannot be cut with a grindstone; also that, by increasing the *durability* of metals, chromium augments their sonorousness, which renders them more suitable for the manufacture of bells, gongs, trumpets, piano strings, etc., than theretofore. In his French patent Placet adds to the above-quoted matter a further statement as follows:

"Which serve to make wires of high electrical resistance."

This is the best disclosure of the prior art. It seems to be established by the evidence that these broad statements are not strictly true when tested by experiment, so that any one skilled in the art would have to do much experimenting to reach a practical workable alloy. No one ever did make such an alloy, notwithstanding Placet's valuable disclosures, for ten years after his patent; Marsh being ignorant of his discoveries in this respect.

In view of the great merit of the Marsh invention, as it seems to me, I think it should not be held anticipated, and that it is valid and infringed. The record is full of difficulties, complexities, and scientific points, although counsel on both sides seem to have pretty fully mastered them.

A decree should be entered for plaintiff as prayed for.

### On Reargument

Russell Wiles, of Chicago, Ill., for plaintiff.
Edward Rector, of Chicago, Ill., for defendant.

A reargument was had on the question of the construction of the file wrapper, a point not fully argued on final hearing. Incidentally the question of infringement was also reargued.

[7] Some of the statements of the original opinion need to be modified. It is stated that Marsh was surprised at the great durability of his alloy. This is not quite correct. It should have been said that Marsh understood the great durability of his resistor, since he says it is "particularly durable" and "nonoxidizable to a very high degree," but did not at all appreciate the relative unimportance of the quality of resistivity compared with that of durability. Since electrical resistance varies inversely as the cross-section is increased or diminished, a wire or strip of low resistance, like platinum, may be made to give as much heat as one of high resistance by lessening the cross-section. The main question is whether one will resist oxidation or last as long as the other. This misapprehension of the patentee is not material,

because he is entitled to all uses and properties of his discovery, whether known or disclosed or not.

"A patentee may be baldly empirical, seeing nothing beyond his experiments and the result; yet if he has added a new and valuable article to the world's utilities, he is entitled to the rank and protection of an inventor." The Grant Tire Case, 220 U. S. 428, 31 Sup. Ct. 444, 55 L. Ed. 527.

On the second hearing plaintiff's attorney made the point that electrical resistance material and electrical resistance element are distinguishable, as such terms are used in the Patent Office, in that the word "material" may mean a chunk, bar, or ingot of alloy, which will make either a good toaster wire or a good bird-cage, while if the word "element" is employed the use merely as a wire is excluded, and the idea of system or part of a whole is suggested, such as drawing or rolling the material, and introducing it into an electric circuit. To explain this distinction further, it is said the Patent Office is accustomed to ignore an introductory adjective or adverbial phrase in a claim, on the theory that an introductory phrase in a combination claim is not an element of the combination and does not limit the claim, as held in W. W. Sly Mfg. Co. v. Russell & Co., 189 Fed. 61, 65, 110 C. C. A. 625. The distinction referred to is illustrated in the following Patent Office decisions: Ex parte Shepler, 102 O. G. 468; Seeley v. Baldwin, 117 O. G. 2633, 2634; Andrews v. Nilson, C. D. 1906, 123 O. G. 1667; Ex parte Mayall, Commissioner's Decisions 1873, 136; Ex parte Gally, 107 O. G. 1660, C. D. 1903, 480; Ex parte Casler, 90 O. G. 446, 448.

While there is force in this contention, it seems to be inapplicable, because the Marsh file wrapper contents show that the examiner understood the words in question to mean exactly the same thing. All his acts show this. In his first action, after citing four references, he says:

"These alloys being old, no invention was exercised in selecting them in place of other metals or alloys as a resistance *element*."

Marsh then amends by changing "material" to "element," both in the specifications and claims. In his next action the examiner substitutes "resistance *bodies*" for "a resistance element," showing clearly that the use of the word "element" had no particular significance with him. Applicant then amended the first claim to its final form, added claim 5, and fully explained his invention to be a high resistance element, saying that he did not discover a nickel-chromium alloy, but that such an alloy has high electrical resistance. He says:

"Some of the most important inventions have consisted in the practical application of the discovery of a new property of matter, and this invention is of that class."

Marsh had now so defined his invention that the examiner understood he was claiming a new use in an electric circuit of an old material or body, better described in such specific relation as an electric resistance element, and the claims were promptly allowed. I agree entirely with defendant's counsel in the argument on rehearing that:

"The examiner never for a moment thought to have any distinction between the words material and element."

And the whole matter of changes in the claims is clearly and satisfactorily summed up by Mr. Rector in saying that:

"In the amended claims, now explained and defined, we do not find the alloy set forth in his claims in any of the references."

That is (to quote the argument to the examiner), there is no such alloy in the prior art used as a resistance element.

It follows that Marsh did not materially change claim 4. He asked for an alloy of nickel and chromium to use as a resistance material or element, and got it under somewhat different language. The important point is that as soon as he pointed out just what he wanted, and made the examiner understand that he did not want a nickel-chromium alloy for any or all purposes, but only for one, he got it.

It is erroneously stated in the opinion that defendant's calorite contains 8 per cent. of iron. Calorite is in fact composed of nickel 65, chromium 12, iron 15, and manganese 8. It is conceded that, if the addition of the iron and manganese does not materially affect the alloy as a resistance element, then defendant's material is the same as plaintiff's. To cheapen the material or increase ductility or workability is not material, since these qualities do not affect resistivity or durability.

The question of infringement depends on whether defendant's addition of 15 parts of iron and 8 of manganese to the nickel-chromium alloy of the patent substantially changes it, not in weight, ductility, capacity to be drawn or rolled, or any other nonelectrical property, but in its properties when placed in an electrical circuit as a heat-producing element. In this position the important properties are durability under high temperature, specific resistance or resistivity, melting-point, and temperature coefficient of resistance, meaning how much resistance rises or falls with each degree of change of temperature of the wire. One form of the patented alloy contains 65 parts of nickel and 35 of chromium. Calorite has nickel 65, chromium 12, iron 15, manganese 8. In other words, calorite has 65 parts nickel and 35 chromium mixed with other things, and if the other things do not change its properties infringement is established.

[8] On this question defendant called a number of witnesses, who, among other things, referred to several tests to determine resistance, durability, and other matters, together with chemical analysis to find out what the Marsh resistor wire was made of. These tests, as well as those later made for plaintiff, were entirely ex parte. Plaintiff made no objection to the tests on the ground that they were ex parte, and, as for those for durability (the most important point), it would be inconvenient to make any other than a one-sided test, on account of the time consumed. On rebuttal plaintiff called the patentee, Marsh, who gave a most complete and thorough deposition on alloys generally, and particularly those containing nickel and chromium, and in the course of his testimony related numerous tests he had made to determine the properties of his resistor as compared with calorite. He was asked by plaintiff's attorney to discuss the tests made of the plaintiff's and defendant's wires and those of the prior art, and to this question no objection of any kind was made. After Marsh had fully completed.

his direct testimony, and before cross-examination, the following objection was made:

"Counsel for defendant objects to the deposition of the witness given thus far, as immaterial and incompetent, and also as speculative, argumentative, and largely hearsay."

It will be noticed that this objection does not raise the question of the tests being ex parte, and is much too general to apprise plaintiff that he must obtain better evidence of the properties of these alloys. The objection so made was not renewed on either of the hearings, nor raised at all in any way until suggested in a printed argument filed after the rehearing. If objection had been made at the hearing that the tests of Marsh were ex parte, and could not properly be considered, this would have been soon enough, because the court might even then have arranged for a test by an indifferent person in the presence of both parties, or by plaintiff with the right of inspection by defendant. This would have taken a considerable time, but was the only way to obviate objection to ex parte tests, which are generally disregarded by the courts, and as a general rule should not be relied on.

In this case the numerous tests on both sides seem to have been fairly made and assumed by both parties to be correct. Defendant's laboratory is evidently exceedingly well manned, and one would not look for tests intentionally misleading from that source. On the other hand, Marsh's testimony impresses me as fair, accurate, and frank. I can see no reason for disregarding the evidence on either side. I also think that the case may be rested entirely upon defendant's tests, and Marsh's testimony rejected, because its experts found the Marsh material and calorite to be quite alike in resistivity and durability, or resistance to oxidation at high temperatures, as shown by defendant's tests. The Marsh element had a resistance of 102, and "exhibits in a marked degree resistance to oxidation at temperatures approximately 800° C.," and calorite had a resistance of 110 to 112, and "resists oxidation at elevated temperature, for example, at temperatures of 800° C., to a marked degree."

It appears from defendant's testimony that it secured two specimens of the Marsh material for examination, and analyses were made, showing nickel 73.76, chromium 20.23, iron 2, manganese ½, silicon ⅓. While these small amounts of iron and manganese were probably only impurities in the nickel or chromium, of course, the idea of increasing the iron for greater ductility, and the manganese for deoxidation and better refining, was at once suggested, though probably no suggestion of the kind was necessary to chemists of the ability of those in defendant's employment. They then tried an alloy of nickel 70, chromium 20, iron 8, manganese 1, and found it exceedingly durable and of high resistance. The iron was used to get within the Placet disclosure, and outside Marsh; a proceeding entirely permissible and proper, though somewhat hazardous. An alloy of 75 nickel and 25 manganese was then suggested, so as to clearly escape the Marsh patent, and was found to give great life and resistance. It was, however, abandoned, and calorite finally adopted. An alloy of nickel 60, iron 20, chromium 15, and manganese 5 was then tried, and found to give

a high resistance and great durability. This alloy was called Placet wire, and had substantially the same properties as the calorite afterwards adopted by defendant. The engineer in charge of defendant's testing laboratory, Dr. Capp, testified that iron and manganese improve the workability of the alloy, and in his opinion increase its resistivity; but he claims no difference in durability, and only a 10 per cent. difference in resistivity.

When we come to Marsh's testimony, it is found that he obtained a resistivity of 110 in an alloy of 65 nickel and 35 chromium, and that in durability, melting point, and temperature coefficient the two alloys are practically the same. Even if a difference in resistivity be conceded, this is much less important than durability, because resistance varies inversely as the cross-section of the conductor. If a wire of lower resistance is drawn a little finer, it may have the same resistance as a little coarser wire made of a higher resistance element. Marsh's account of his tests substantially corroborates those of the defendant.

On the whole, I am satisfied that plaintiff's and defendant's alloys are substantially the same in all but composition, and that there is very little disagreement between the evidence on each side in respect to the real nature of the two.

There should be a decree for plaintiff.